In the

# United States Court of Appeals
### For the Seventh Circuit

No. 05-3554

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

KELLY PETERSON-KNOX,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 01 CR 1093—**Harry D. Leinenweber**, *Judge.*

ARGUED APRIL 13, 2006—DECIDED DECEMBER 20, 2006

Before COFFEY, KANNE and WILLIAMS, *Circuit Judges.*

COFFEY, *Circuit Judge.* On October 3, 2002, a federal grand jury indicted Kelly Peterson-Knox ("Peterson"), and her fellow conspirators, Michael Knox, Joe Fasanella, Charlie Rogers, and James Babiarz for mail fraud, 18 U.S.C. §§ 1341, 1346, and 2. The sixteen-count indictment alleged that Peterson and the above-named conspirators engaged in a scheme to defraud Ameritech by arranging for Ameritech-owned computers to be shipped and sold for profit to non-Ameritech personnel without authorization. Peterson initially pleaded not guilty to each of the sixteen counts charged, but subsequently withdrew her plea and entered a plea of guilty to one count of mail fraud, without the benefit of a formal written

plea agreement. After accepting Peterson's plea and entering a judgment of conviction, the district court judge sentenced her to a term of 30 months' imprisonment and three years' supervised release, restitution (to Ameritech) in the amount of $507,600, $100 special assessment, and dismissed the remaining fifteen counts. Peterson appeals her sentence, contending that the district court improperly applied the advisory Sentencing Guidelines. She argues that the evidence presented at sentencing failed to support the findings underlying the three enhancements in her offense level. She requests that her sentence be vacated and remanded for resentencing. Affirm.

## I.  Factual Background

According to the indictment, Peterson and Knox (her husband) were the organizers and lead conspirators in a plan to defraud the Ameritech company between September of 1999 to early May of 2000. During this time frame the two became romantically involved and also began to share a residence. During the course of the fraud, Peterson served as manager of Ameritech's Business Communication Services—Desktop Support Division and was responsible for supplying laptop computers exclusively to Ameritech personnel at various locations within the United States for use in conducting Ameritech business. Her position authorized her to order computers and arrange for the shipment thereof based on orders received from various department heads within the corporation. It is interesting to note that Michael Knox, in his capacity as a manager of the Information Technology Department, also had the authority to order and ship computers to Ameritech employees. In connection with their employment, both Peterson and Knox had agreed and were obligated to follow Ameritech's *Code of Business Conduct*,

which required that employees are not allowed to use corporate property for personal use nor engage in any form of fraud. Despite that agreement, the two organized and operated a scheme to sell and ship Ameritech-owned computers to themselves and their co-conspirators. The conspirators, on occasion, also on their own arranged for the sale of the computers to third parties as part of this venture. Peterson let her co-conspirators know that she expected to receive $800 from each sale, while allowing Fasanella and others in the conspiracy ring to retain any additional funds received from the transaction. Peterson and Knox would submit an inflated number of orders, calling for the shipment of a greater number of new Dell laptops to be purchased than requested by the department heads. Due to Peterson's and Knox's managerial positions in the organization, the orders were approved without hesitation. Peterson's department was solely responsible for the delivery of the computers to authorized Ameritech employees, thus leaving Peterson in control of the excess laptops generated with falsified purchase orders. Peterson or Knox would take possession of the surplus laptops, and would usually package them into different boxes. Once received in Peterson's department they would arrange to address the packages to their fellow conspirators, fraudulently indicating on shipping labels that the packages were destined for Ameritech employees, and arrange for the transfer thereof to the shipping dock to be delivered via United Parcel Service ("UPS").

During the first four months of the operation, Knox and Peterson addressed the computer shipments to their shared residence or to Joe Fasanella's (Peterson's brother), his home or work address. Initially, Fasanella would hold the packages until Peterson was able to pick them up. In the fall of 1999, Fasanella began selling the new Dell laptop computers at his home via classified newspaper advertisements.

Shortly after Fasanella became a retailer for the stolen laptops, Peterson inquired of him whether he knew of anyone else that might be interested in buying or selling the ill-gotten computers. Fasanella in turn contacted one Charlie Rogers, who had earlier purchased one of the computers from him in the fall of 1999, and at the time expressed an interest in receiving additional laptops. During an earlier conversation with Fasanella, Rogers agreed to take part in the retailing of the hot computers and then began to receive shipments in January of 2000 at his place of employment, a car dealership. Rogers proceeded to sell a number of the computers, and returned the unsold laptops to Fasanella. Rogers, like Fasanella, was allowed to keep any proceeds in excess of the $800 per computer he was obligated to give to Peterson pursuant to their agreement. In January of 2000 alone, Rogers received ten shipments, each consisting of four new laptops. After several weeks Rogers's immediate superior at the car dealership ordered him to cease receiving any more shipments at work.

In light of the inability of Rogers to continue to receive computers at work, Fasanella attempted to convince Rogers to accept the shipments at his residence. In fact, Fasanella went so far as to detail to Rogers the inner-workings of the conspiracy and assured him that no one at Ameritech had or would detect the missing laptops because of the supervisory and upper managerial positions Peterson and Knox held in the company. Fasanella also explained that because of Ameritech's lack of sufficient internal controls and inadequate security, the laptops were sitting out in the open in the hallways, leaving them open to the opportunity for almost any passerby to walk off with a computer. Based on this information, Rogers agreed to receive the computer shipments at his home and, in order to ensure his anonymity, he asked that the laptops be addressed to his father-in-law, "Joe

Koszela." Fasanella agreed and arranged for the necessary arrangements, and the shipments resumed.

From January 26, 2000, to February 10, 2000, Rogers received approximately sixty of Ameritech's new Dell laptops at his home via UPS. Despite the enterprise's ongoing success and Fasanella's assurances that Ameritech would not be tracking the packages, Rogers became increasingly wary of his participation in the illegal sales plot. Thus, after serving as the sole sales person for 100 hot computers for nearly two months, in early February of 2000, Rogers told Fasanella he was no longer interested in continuing to participate in the computer sale out of his home. Rather than end his involvement in the theft and sale program and forfeit the further profit, Rogers suggested that the deliveries be made to a James Babiarz, who Rogers had learned, after speaking with a third-party (identified only as "Individual A"), was willing to also take part in the fraudulent strategy.

Fasanella agreed, and on February 15, 2000, Babiarz received his first shipment at his home (consisting of seven new Ameritech laptops) under the alias "John Kelly." Initially, Babiarz served solely as a middleman, and agreed to deliver the computers to Rogers immediately upon receipt of the same. But, in late February, after participating as a "go-between" in a number of shipments, Babiarz's status changed at his request and he began to take an active part in the fraudulent sale scheme, retailing a number of the laptop computers from his home.

After shipping some 200 computers over the course of eight months (Sept. 1999-May 2000), the plot began to unravel. In early May of 2000, an Ameritech employee discovered that several UPS shipments were addressed and being forwarded to non-Ameritech locations. Concerned, the employee contacted Susan Meyer, an investiga-

tor in Ameritech's Corporate Security Department. Shortly after Meyer became aware of the in-house problem she commenced her investigation and began with a review and a comparison of the shipping records of UPS and Ameritech and discovered shortly thereafter that during the preceding sixteen months a number of deliveries had been made to non-Ameritech locations to persons whom she believed were not affiliated with the company. Specifically, Meyer identified each of the addresses participating in Peterson and Knox's fraudulent artifice,[1] including Babiarz. On May 10, 2000, Meyer intercepted and took custody of a package in Ameritech's shipping department addressed to Babiarz's residence. Meyer summoned law enforcement officers to Ameritech's offices, opened and inspected the suspect package and discovered several new Dell laptop computers therein. At this time the officers arranged for a controlled delivery to his address, and during a search of Babiarz's residence subsequent to the delivery and his arrest, officers uncovered several empty Dell laptop computer boxes. And upon comparing the serial numbers of the computers with Ameritech's purchase and delivery records, Meyer determined that each of the boxes contained one new Dell laptop.

After receiving this information from Meyer, Ameritech senior officers directed her and other corporate personnel to continue with an in-depth investigation in hopes of ascertaining the magnitude of the fraud. Based on their

---

[1] In all, Peterson and Knox shipped computers to seven non-Ameritech locations between September 1999 and May 2000: their joint residence, Joe Fasanella's residence and place of employment, Charlie Rogers's residence and place of employment, James Babiarz's residence, and the workplace of Peterson's mother, who unwittingly received the computers and turned them over to Peterson and was not involved in this prosecution.

investigation, Meyer and her team discovered that during the years 1999 and 2000 Ameritech purchased 1,945 new Dell laptop computers, all of which had been routed and shipped to and through Peterson's department. Next they compared UPS shipping records with Ameritech records and work orders in hopes that it might assist in determining whether or not that any of the computers had previously been used. They also contacted a number of former and current Ameritech employees and searched stockrooms and other company facilities where computers might have been stored. Ultimately, Meyer was unable to account for 646 of the 1,945 laptop computers purchased by Ameritech and recorded as having been received in Peterson's department. Upon further investigation and review of UPS and Ameritech records, Meyer determined that at least 216 of the 646 missing laptops were delivered to the addresses of the individuals referred to by Peterson and Knox in carrying out their fraudulent scheme.[2]

After completion of the joint investigation, the evidence of fraud was presented to a grand jury convened for that purpose. The grand jury subsequently returned a sixteen-count indictment, charging Peterson, Knox, and their fellow conspirators (Fasanella, Rogers, and Babiarz) with mail fraud, contrary to 18 U.S.C. §§ 1341 and 1346. Fasanella went to trial and was found guilty while Rogers,

---

[2] The investigators took the controlled package and weighed it knowing the number of laptops in the controlled package. Meyer calculated that each of the laptops weighed approximately twenty pounds. Meyer then used that conservative weight estimate along with UPS records which charge packages per pound, to determine the number of laptops contained in each of the packages delivered to the suspect addresses—ultimately determining that at least 216 laptops had been shipped between September 1999 and May 2000.

Babiarz and Knox entered guilty pleas. As Peterson's trial date became imminent, and when faced with a mountain of evidence, she withdrew her plea of not guilty and entered a plea of guilty to one count of mail fraud without the benefit of a formal written plea agreement on March 18, 2003, approximately two weeks before the matter was set to proceed to trial.

After the close of evidence at Peterson's plea hearings, the government argued that her base offense level of six should be increased ten points based on the amount of loss (value of the misappropriated computers), U.S.S.G. § 2F1.1(b)(1) (1998);[3] two points for more than minimal planning, § 2F1.1(b)(2); four points based on her role as an organizer or leader in the conspiracy, § 3B1.1(a); and two points given for abusing a position of trust, § 3B1.3. Ultimately, after awarding a two-level decrease due to her acceptance of responsibility, § 3E1.1(a),[4] the government calculated Peterson's total offense level at 22 and recommended a sentence of 46 months' imprisonment. Peterson did not contest the applicability of § 2F1.1(b)(2), conceding that the offense involved more than minimal planning, but she did object to each of the government's

---

[3] The parties stipulated that the 1998 Sentencing Guidelines would apply as they were in effect and applicable at the time of the commission of the offense. Accordingly, all citations to the Sentencing Guidelines in this opinion are to the 1998 version.

[4] The Presentence Investigation Report ("PSR") stated that Peterson's guilty plea was untimely (namely, that it occurred after the government had prepared for trial) and did not allow for the application of the additional one-point reduction permitted under § 3E1.1(b)(2). Moreover, the report noted that Peterson had failed to provide a statement detailing her involvement in the fraud to the government during the course of the pretrial investigation.

remaining recommended offense level enhancements referred to above as well as the sentence recommended.

At the close of Peterson's three sentencing hearings, the trial judge determined the amount of loss Ameritech incurred to be somewhere between $500,000 and $800,000, and thus increased Peterson's offense level accordingly by ten points. The court calculated the loss amount multiplying 216, the number of new computers determined to have been stolen during this phase of the fraud, by $2,350 (a conservative estimate of each computer's value)[5] resulting in a loss of $507,600. This amount of loss incurred increased Peterson's offense level from six to sixteen. After finding that the offense involved established more than minimal planning, § 2F1.1(b)(2)(a); that Peterson was an "organizer, leader, manager, or supervisor in any criminal plan," § 3B1.1(c); abused a position of trust in committing the offense, § 3B1.3; and had accepted responsibility, § 3E1.1(a); the judge calculated Peterson's adjusted total offense level at 19, yielding a guideline sentencing range of 30 to 37 months. Noting that he saw no reason to exceed the minimum under the Guidelines, the trial judge sentenced Peterson to a term of 30 months' confinement followed by three years of supervised release, a $100 special assessment and ordered that she jointly and severally make restitution payments, with each of her co-defendants, to Ameritech in the total amount of $507,600.[6] The following day, the remaining fifteen counts of mail fraud filed against Peterson were dismissed

---

[5] Ameritech had purchased each of the new Dell laptop computers for between $2,350 and $2,650.

[6] Knox was sentenced to 51 months' confinement followed by three years of supervised release and ordered that he jointly and severally make restitution payments, with each of his co-defendants, to Ameritech in the amount of $507,600.

pursuant to the agreement with the prosecutor's office on motion of the government.

## II. Issues

On appeal Peterson raises three challenges to the sentencing court's application of the Guidelines. She contends that the imposition of a ten-point increase in her offense level pursuant to § 2F1.1 was improper because the sentencing judge's calculation of the loss was not supported in the evidence. She also argues that the district court's determination that she was an organizer, leader, manager, or supervisor of the fraud for purposes of § 3B1.1(c) was erroneous. And further, she disputes the imposition of a two-level increase based on her abuse of a position of trust, § 3B1.3.

## III. Discussion

### A. Calculation of Loss

Section 2F1.1(b) of the Sentencing Guidelines applies to crimes of fraud and deceit and permits a sentencing judge to increase a defendant's guideline offense level pursuant to the amount of monetary loss resulting from the defendant's criminal activity. The district court's finding that Ameritech suffered a loss of $507,600 due to the criminal actions of Peterson and her co-conspirators resulted in the ten-point increase in her offense level.

A trial court's calculation of the loss caused by a defendant's fraudulent conduct is a finding of fact, reviewed on appeal for clear error only. *United States v. Dillard*, 43 F.3d 299, 309 (7th Cir. 1994) (citing *United States v. Strozier*, 981 F.2d 281, 283 (7th Cir. 1992)). "For purposes of [§ 2F1.1(b)(1)], the loss need not be determined with

precision." U.S.S.G. § 2F1.1, Application Note 9. Rather, "[t]he [sentencing] court need only make a reasonable estimate of the loss, given the available information." *Id.* When appealing a district judge's calculation of loss, the defendant bears a heavy burden in his attempt to prove that the determination "was not only inaccurate but outside the realm of permissible computations." *United States v. Lopez*, 222 F.3d 428, 437 (7th Cir. 2000) (citing *United States v. Hassan*, 211 F.3d 380, 383 (7th Cir. 2000)). "Reversal is warranted only if the district court's loss calculation evokes a 'definite and firm conviction that a mistake has been made.'" *United States v. Schaefer*, 291 F.3d 932, 937 (7th Cir. 2002) (quoting *United States v. Strache*, 202 F.3d 980, 984-85 (7th Cir. 2000)).

In the present case, we are convinced that the government offered more than sufficient evidence to establish the total number of computers shipped to the various addresses associated with the fraud (216) as well as evidence pertaining to the value of each of the new Dell laptop computers purchased by Ameritech ($2,350). Next the government established a calculation of the loss based on the aggregate value of the number of laptop computers shipped to those addresses ($507,600). Peterson did not dispute that 216 computers were taken from Ameritech offices without consent as part of the scheme much less the estimated value of each new Dell laptop. Instead, her sole contention was that the first twenty-four illegally misappropriated computers were used rather than new laptops, and, thus, the government's loss calculation was inaccurate (inflated). In support of her position, Peterson presented documentary evidence of an interview between one of her co-defendants, Joe Fasanella, and the government. During the interview, Fasanella (Peterson's brother) stated that the computers he initially received "appeared to be used." Peterson goes on to argue that Fasanella's statements, combined with her conten-

tion that the first twenty-four computers were in fact used, establishes clear error was committed on the part of the district judge when he calculated the amount of loss. We disagree.

In response to Peterson's contention at sentencing that some (24) of the computers were in fact used, the government presented evidence to the contrary, including the testimony of Ameritech Investigator Susan Meyer, who was responsible for conducting the in-depth investigation of the fraud. When directly questioned if, during the course of her investigation, she discovered any evidence supporting Peterson's claim that some of the 216 computers at issue were used, Meyer was emphatic and clear that "[she] found no evidence to that [effect]." Meyer also testified that in September of 1999, Ameritech instituted new tracking procedures for its used laptops, ensuring an accurate record of their whereabouts once they had been shipped or returned to the company. In corroboration of Investigator Meyer's testimony that each of the computers was in fact new rather than used, the government introduced the prior sworn testimony of Charlie Rogers (from Fasanella's trial), another of Peterson's co-defendants. At the trial of Peterson's brother, Joe Fasanella, Rogers testified that he purchased a new laptop computer from Fasanella in the fall of 1999, during the time period when Peterson contends that only used computers were shipped.[7] This evidence is obviously in direct contradiction to that of Peterson who stated that the first twenty-four computers were, in fact, used laptops.

And while Peterson contends that Fasanella's statements should be afforded significant weight when cal-

---

[7] According to documentary evidence, which Peterson agrees is accurate, the first twenty-four computers were shipped from her department between the fourth of September, 1999, and December 14, 1999.

culating the amount of loss, considerable evidence to the contrary was presented to the trial judge. As an example, in his written statement Fasanella admitted that he had never opened any of the packages of the purportedly used computers, and simply relied on Peterson's representations to him when arriving at his conclusion that they were used. Furthermore, several other statements Fasanella made during the course of the interview were in direct conflict with the documentary evidence presented to the court. Because the sentencing judge's calculation of loss was formulated only after resolving the factual dispute over the question of whether the laptops were new or used—which was inherently dependent on his assessment of the credibility of Meyer and Rogers—we give special deference to his finding, as he had the best opportunity to observe the witnesses while testifying in the courtroom. *Mlsna v. Unitel Communications, Inc.*, 91 F.3d 876, 880 (7th Cir. 1996) ("district court determinations of credibility are entitled to special deference, since they often depend on a witness's demeanor and appearance on the stand, from which appellate courts are totally removed") (citations omitted). *See also United States v. Mancillas*, 183 F.3d 682, 701 n. 22 (7th Cir. 1999) ("[w]e do not second-guess the [trial] judge's credibility determinations because he or she has had the best opportunity to observe the verbal and nonverbal behavior of the witnesses focusing on the subject's reactions and responses to the interrogatories, their facial expressions, attitudes, tone of voice, eye contact, posture and body movements, as well as confused or nervous speech patterns in contrast with merely looking at the cold pages of an appellate record") (alterations in original) (*United States v. Garcia*, 66 F.3d 851, 856 (7th Cir. 1995)). After review, we hold that Peterson has failed to establish that the district court erred in calculating the amount of loss and imposing a ten-point increase in her offense level pursuant to § 2F1.1(b).

### *B.  Role in the Offense*

Peterson next claims that it was clear error for the district court to find that she was an organizer, leader, manager, or supervisor under the Guidelines. Again she argues that the judge's determination was not supported with sufficient evidence. Specifically, she avers that the record was barren of any evidence establishing that she had recruited anyone to participate in the plot or that she exercised control over any of the other participants. We disagree.

Under U.S.S.G. § 3B1.1(c), a defendant's offense level is increased by two points "if the defendant was an organizer, leader, manager, or supervisor" of the criminal activity for which he or she was convicted. In determining the provision's applicability, a sentencing court should consider the following factors:

> the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

U.S.S.G. § 3B1.1, cmt. (n.4). No single, particular factor need be present to justify an offense level increase, *United States v. Fones*, 51 F.3d 663, 665 (7th Cir. 1995) (citations omitted), nor must each be afforded equal weight, *United States v. Matthews*, 222 F.3d 305, 307 (7th Cir. 2000). Rather, each factor should be weighed in light of the Guideline's specific intent: "to punish with greater severity the leaders and organizers of criminal activity." *United States v. Sierra*, 188 F.3d 798, 804 (7th Cir. 1999). *See also Fones*, 51 F.3d at 665 ("[t]he central purpose of § 3B1.1 is to punish a defendant for his relative responsibility within a criminal organization . . . . [h]ence, no single

factor is essential to determining whether a sentence should be adjusted under [the guideline]") (internal citations omitted). "The district court's determination concerning the defendant's role in the offense is a finding of fact, subject to a clearly erroneous standard of review on appeal." *United States v. Hankton*, 432 F.3d 779, 793 (7th Cir. 2005) (internal quotation marks and citation omitted).

At sentencing, the government presented a wealth of information (factors) in support of its position that Peterson was an organizer or leader within the meaning of § 3B1.1(a). Ameritech Investigator Susan Meyer testified that Peterson received almost every new Dell laptop computer ordered by Ameritech and shipped out to designated recipients. Because of this, Peterson obviously had significant control over the number of computers ordered and shipped out. There is no doubt that Peterson alone was responsible for the receipt and shipment of approximately forty-five laptop computers to her co-conspirators between March and May of 2000. Thus, the totality of information in the record certainly weighs heavily in favor of finding that Peterson was an organizer, leader or manager under the Guidelines. *See Fones*, 51 F.3d at 666 (discussing the defendant's control over the amount of contraband transacted in the context of evaluating the applicability § 3B1.1).

In further support of a role adjustment, the government presented more than sufficient evidence demonstrating the considerable degree of control Peterson exercised over many of the co-defendants and the entire fraudulent scheme. It offered statements from Peterson's brother, Joe Fasanella, wherein he detailed how Peterson had approached him and asked if he knew anyone interested in buying or selling the computers. Based on that conversation, Fasanella enlisted the services of Charlie Rogers, who, at a later date, recruited James Babiarz.

Fasanella's enlistment of Rogers, at Peterson's insistence, like her ability to dictate the size and frequency of the shipments, is indicative of Peterson's leadership role and control within the criminal enterprise and satisfies application of § 3B1.1(c).

Fasanella's statements also demonstrated that Peterson and Knox received the bulk of the ill-gotten proceeds from the criminal activity. During a meeting with law enforcement officers, Fasanella stated that Peterson insisted that she receive $800 for each of the computers sold under the table. He estimated that he turned over to Peterson and Knox between $70,000 and $80,000 cash in total to the fraudulent scheme. Bank account records confirmed Fasanella's statement, revealing that during the course of the fraud Peterson and Knox deposited approximately $60,000 in cash into their accounts plus an additional $6,000 in cash that was used to pay various expenses associated with Peterson and Knox's wedding in August of 2000.

In spite of the evidence presented to the trial court, Peterson somehow justified characterizing her role as only that of a "middleman," fronting contraband (computers) to the enterprise's fellow participants in a manner similar to that commonly found in drug cases, undeserving of an increase under § 3B1.1. *See United States v. Vargas*, 16 F.3d 155, 160 (7th Cir. 1994); *United States v. Brown*, 944 F.2d 1377, 1381-82 (7th Cir. 1991); *United States v. Guyton*, 36 F.3d 655 (7th Cir. 1994). We agree with the sentencing court that the facts in this case clearly establish that Peterson's role in this criminal offense was far more important than that of a "middleman." She determined the number and frequency of the fraudulent shipments, participated in the recruitment of additional members to carry out the fraudulent plot, and set the price she would be paid for each computer sold. Peterson was the heart, soul and main artery of the fraud. This being

the case, we refuse to hold that the district court clearly erred in applying § 3B1.1(c).

### C. Abuse of Trust

Section 3B1.3 of the Sentencing Guidelines provides for a two-point increase in a defendant's offense level if "the defendant abused a position of public or private trust . . . in a manner that significantly facilitated the commission or concealment of the offense." In determining whether the provision applies, this court employs a two-part test that tracks the Guidelines. *United States v. Sierra*, 188 F.3d 798, 802 (7th Cir. 1999). Initially, we review "whether the defendant occupied a position of trust; and [second, we examine] whether [the] abuse of [that] position of trust significantly facilitated the crime." *United States v. Stewart*, 33 F.3d 764, 768 (7th Cir. 1994). The district court's determination in each respect is a factual one, which we review for clear error. *Id.*

Because Peterson does not argue that her management position was not a position of trust, we need only determine whether her abuse of that position facilitated the offense. *See, e.g.*, *Palmquist v. Selvik*, 111 F.3d 1332, 1342 (7th Cir. 1997) ("Even an issue expressly presented for resolution is waived if not developed."). A defendant's position of trust significantly facilitates a crime for purposes of § 3B1.3, "if the defendant's position made it substantially easier to commit or conceal the crime, significant facilitation occurred." *Sierra,* 188 F.3d at 802 (citing *Stewart*, 33 F.3d at 768). In an effort to prove the district court committed clear error, Peterson goes out on a limb contending that Ameritech's lack of proper safeguards and controls against computer theft facilitated her commission of the fraud. Her theory falls far short of achieving its desired result. It was Peterson's position of

trust that enabled the fraud to commence and continue until Meyer took over.

Peterson violated her position of trust by taking advantage of the company's lack of safeguards, checks and controls in the purchasing and shipping departments. Peterson was able to create a surplus computer inventory because Ameritech had entrusted her with the authority to order, receive and distribute laptops to its employees without installing a foolproof auditing and control system. The orders she submitted to Ameritech's purchasing department were almost automatically "approved without hesitation," ensuring that her criminal activity (false orders) would go undetected. Obviously she violated her managerial position and Ameritech's *Code of Business Conduct*. Also, Peterson's position enabled her to create and destroy shipping labels used in furtherance of the scheme and to direct unwitting subordinates to ship computers to non-employees, which concealed her personal involvement, without arousing suspicion. From the wealth of evidence presented to the district judge, it is apparent that Peterson's position and authority significantly facilitated the commission of the offense and the concealment of her involvement, thereby justifying the increase in the period of confinement under § 3B1.3.

## IV. Conclusion

We hold that the district court did not err in imposing a ten-point increase in Peterson's offense level based on its calculation of loss, pursuant to § 2F1.1(b); a two-point increase based on its determination that she was an organizer or leader of the criminal activity, under § 3B1.1(c); and a two-point increase based on its finding that she abused a position of trust, as contemplated by § 3B1.3. Peterson's sentence is AFFIRMED.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*