In the

# United States Court of Appeals

## For the Seventh Circuit

———————

No. 06-2205

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

GERALD E. ANDERSON,

*Defendant-Appellant.*

———————

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 04 CR 789—**Ruben Castillo**, *Judge*.

———————

ARGUED SEPTEMBER 13, 2007—DECIDED FEBRUARY 28, 2008

———————

Before EASTERBROOK, *Chief Judge*, and CUDAHY and SYKES, *Circuit Judges*.

CUDAHY, *Circuit Judge*. Gerald Anderson and John Meisch have been friends since 1967. Anderson was a successful real estate developer who owned a lot of valuable property around Aurora, Illinois. John Meisch was an Alderman for the City of Aurora and served as its Mayor *Pro Tem*. In December 2004, Anderson and Meisch were indicted on charges of bribery and wire and honest services fraud. The two men had been caught offering a $10,000 bribe to the Aurora Director of Public Works

in order to smooth the way for Anderson's development project. Meisch pleaded guilty and testified against Anderson at trial. Anderson was ultimately convicted on two counts. He now appeals, arguing mainly that his six-year sentence should be reduced. Many of his arguments are without merit but he does have one substantial challenge to his sentence. He argues that the district judge improperly calculated his sentencing range under the U.S. Sentencing Guidelines by overestimating the net benefit he received from his wrongdoing. We agree that the district court improperly calculated the Guidelines range but we find that the error was harmless. We AFFIRM.

## I. BACKGROUND

Gerald Anderson owned a number of real estate properties around Aurora, including parcels now known as Grand Pointe Homes and Misty Creek. In late 1997, Anderson was introduced to Jeff Pelock, who was interested in developing homes on Anderson's land. The two men became partners in a venture called Aurora LLC. Anderson put nearly $6,000,000 of property into Aurora LLC, including Grand Pointe Homes and Misty Creek. In return, he received preferred payments for the value of his property as well as 30% of the profits of the business. The two men immediately began developing Misty Creek.

In Aurora, developers typically begin by providing the City's staff engineers with a copy of their preliminary plan. The staff engineers review the plan and pass their recommendation on to the Aurora City Council. If the preliminary plan is approved by the City Council, the developer can submit a final plan to the City for approval. In order to

be approved, a plan must comply with numerous City ordinances and regulations, so developing a plan often involves ongoing negotiations with City officials from various departments.

While Misty Creek was well underway by early 2000, Anderson and Meisch's second project, Grand Pointe Homes, was still in the initial planning stages. Rick Zirk, an employee of Aurora LLC, presented the plan for Grand Pointe Homes to the City's staff engineers but the plan was rejected. Zirk believed that he had gotten an undeservedly hostile reception from the engineers and so went directly to the City Council's Planning and Development Committee. But, on May 31, 2000, the Committee also rejected the plan. The Committee objected, among other things, to the planned density of the project. Anderson decided to take "a more proactive role" with the City. The first thing he did was call his old friend, John Meisch, who was then the Chairman of the Planning and Development Committee.

Pelock and Anderson met with Meisch in early 2001 to complain about the reception their plan had received. Anderson asked Meisch to support his development plans for Misty Creek and Grand Pointe Homes and to garner support from other aldermen. On January 30, 2001, Meisch made a motion before the City Council to have the City annex a portion of Anderson's development (he also voted in favor of the motion). Anderson and Meisch met again in early 2001 to discuss the plan. In September 2001, Anderson had a third meeting with Meisch. During this meeting, Anderson asked Meisch to set up a meeting with the Oswego Park District regarding a bike trail that ran through Grand Point Homes. The Park District was going to take over the trail once the property was developed and it had concerns about its design and location. At the end of

the meeting, Anderson handed Meisch an envelope containing $2500 in cash.

Meisch later met with city officials and officials of the Oswego Park District. Meisch was able to resolve the issues with the Park District and Anderson was able to move forward with his project. On September 10, 2002, Meisch, acting as Mayor *Pro Tem*, signed a resolution approving a plan for Grand Pointe Homes. On February 27, 2003, Meisch supported before the Planning and Development Committee the resolution approving the final plan for Grand Pointe Homes. The plan passed even though the density of the project was greater than it had originally been. In March 2003, Anderson gave Meisch an envelope containing another $2500 in cash.

After Meisch left office, he had a final meeting with Anderson. They discussed a new project at Eola Road, which Anderson owned with another partner, Don Hamman (Aurora LLC was not involved). Anderson hoped that Meisch would assist him as he had in the past. Meisch advised Anderson that he would need to win the approval of Bob Rieser, Aurora's Director of Public Works. Anderson gave Meisch an envelope containing $1000 in cash.

In late 2003, Anderson approached Ken Schroth, a civil engineer for the City of Aurora, to discuss whether Eola Road could be developed without an onsite pond to collect storm water runoff. Anderson believed that an offsite pond was sufficient to comply with Aurora's storm water ordinance but Schroth determined that the offsite pond could not hold all of Eola Road's storm water. Schroth told Anderson that he would need to set aside 15% of the property for an onsite pond. Anderson met with Schroth again several weeks later, and Schroth again insisted that Anderson needed a set-aside.

Rieser was also aware of the set-aside problem. In January 2004, just before Rieser was expected at a meeting of staff engineers regarding the Eola Road project, Meisch appeared in his office and closed the door. Meisch told Rieser, "Gerry Anderson has been very good to me in the past, and . . . he can be very good to you [if you help him with Eola Road]." Meisch said that "there is $10,000 cash that no one would know about" if he supported the project. After Meisch left, Rieser called the Federal Bureau of Investigations, which advised Rieser to play ball with Meisch. At the meeting of staff engineers, Rieser was asked about the sufficiency of the offsite water storage at Eola Road and responded that it was "do-able."

On February 9, 2004, Rieser spoke with Anderson on the phone and asked if he was still "okay" with the $10,000. Anderson assured Rieser that he was. He also told Rieser that he would keep everything confidential. Anderson, Meisch and Rieser arranged a meeting on February 17, 2004. Anderson informed Rieser that he would seek approval for the project only after he had bought out the other owners and wanted to make sure that Rieser would work with his timetable. He also directed Rieser to talk only with Meisch so as to not raise suspicions.

The FBI arrested Anderson on September 22, 2004. He waived his *Miranda* rights and made a number of admissions regarding the bribe offered to Rieser and the payments made to Meisch for Grand Point Homes and earlier projects. On December 14, 2004, Anderson and Meisch were charged with three counts of wire and honest services fraud pursuant to 18 U.S.C §§ 1343, 1346 (Counts I, II, and III) and one count of bribery pursuant to 18 U.S.C. § 666 (Count IV). Meisch pleaded guilty and Anderson proceeded to trial. On September 30, 2005, a jury convicted Anderson of Counts III and IV and acquitted him on

Counts I and II. On April 20, 2006, the District Court sentenced Anderson to seventy-two months in prison, a $100,000 fine and two years of supervised release. This appeal followed.

## II. ANDERSON'S CONVICTION

Anderson raises only one challenge to his conviction. This is not surprising for the evidence presented against him at trial was overwhelming; it included extensive testimony from Meisch and the damaging admissions Anderson made shortly after his arrest. He does make an argument, however, that his conviction should be overturned because the jury rendered inconsistent verdicts when it acquitted him on Counts I and II but convicted him on Count III. At issue are the three counts of wire and honest services fraud. Counts I and II were based on *unrecorded* telephone calls between Meisch and Anderson; the jury knew about the existence of the calls because they appeared in telephone records but never actually heard the conversations or learned of their contents. The jury was apparently asked to infer from suspicious timing alone that the calls were related to the scheme to bribe Rieser. Count III was based on a *recorded* telephone conversation in which Anderson and Rieser clearly discussed the bribe. This call was played aloud for the jury in open court. Shortly before returning its verdict, the jury sent a note to the judge regarding Counts I and II, asking whether it could infer that those calls were made "in furtherance of" the scheme simply from their existence. The jury acquitted on those counts shortly thereafter. Apparently, the jury was not persuaded that the calls actually contained conversations about the alleged scheme.

This does not create an unexplained inconsistency. *See United States v. Young*, 316 F.3d 649, 662 (7th Cir. 2002).

Even if the verdicts were inconsistent, this would not warrant reversal. *See United States v. Powell*, 469 U.S. 57, 69, 106 S. Ct. 471, 83 L.Ed.2d 461 (1984). *United States v. Bevins*, 430 F.2d 601 (6th Cir. 1970), on which Anderson relies, actually illustrates that inconsistency is not grounds for reversal. *Id.* at 602-03. This is also the rule in this circuit. *See United States v. Muthana*, 60 F.3d 1217, 1223 (7th Cir. 1995).

### III. ANDERSON'S SENTENCE

Anderson's appeal focuses largely on sentencing issues. Specifically, he attacks various aspects of the district court's calculation of his sentencing range. We begin with the Sentencing Guidelines. Using the 2003 version of the Guidelines,[1] the district court started with a base offense level of ten. *See* U.S. SENTENCING GUIDELINES MANUAL § 2C1.1(a) (2003). A two-point enhancement was added for multiple bribes. *See* U.S.S.G. § 2C1.1(b)(1) (2003). A fourteen-point enhancement was added because the "benefit received" from the bribe was more than $400,000 but less than $1,000,000. *See* U.S.S.G. § 2B1.1(b)(1)(H) (2003). All of this amounted to a total offense level of twenty-six. When the total offense level was combined with Anderson's criminal history category of I, the Guide-

---

[1] The district court sentenced Anderson in April 2006, four months before our decision in *United States v. Demaree*, 459 F.3d 791 (7th Cir. 2006). *Demaree* held that district courts should apply the Guidelines in force at the time of sentencing, not the Guidelines in force at the time the crime was committed. *See id.* at 795.

lines yielded a sentencing range of sixty-three to seventy-eight months. The district court then sentenced Anderson to seventy-two months in prison.

Anderson raises three basic challenges to his sentence: First, he argues that the district court failed to calculate the proper base offense level because, according to Anderson, his offense conduct involved a gratuity, not a bribe. Second, Anderson argues that the district court over-estimated the "benefit received" and thus erred in its calculation of his total offense level. In particular, he complains that the court did not adequately explain the methodology it used to calculate the benefit figure. Finally, Anderson argues that his sentence is unreasonable in light of § 3553. We review these questions for abuse of discretion. *See Gall v. United States*, 552 U.S. ___, 128 S. Ct. 586, ___ L.Ed.2d ___(2007).

### A. The Application of the Bribery Provisions to Anderson's Conduct

We begin with the calculation of the base offense level. The district court applied the bribery provisions of § 2C1.1 to Anderson's conduct; Anderson believes that it should have applied the gratuity provisions of § 2C1.2. Convictions under § 666 and § 1343 call for the application of either § 2C1.1 or § 2C1.2, whichever is most appropriate or most specifically covers the offense conduct. *See United States v. Agostino*, 132 F.3d 1183, 1195 (7th Cir. 1997); U.S.S.G. § 2C1.7(c)(4) (2003). The question here is simply whether Anderson's conduct was "more akin" to a gratuity or to a bribe. *See Agostino*, 132 F.3d at 1195. Unlike a gratuity, a bribe is a payment made with "a corrupt purpose, such as inducing a public official to participate in

a fraud or to influence his official action." *See* U.S.S.G. § 2C1.1 cmt. background. Thus, we have distinguished bribes from gratuities as follows: "If the payer's intent is to influence or affect future actions, then the payment is a bribe. If, on the other hand, the payer intends the money as a reward for actions the payee has already taken, or is already committed to take, then the payment is a gratuity." *Agostino*, 132 F.3d at 1195. In this case, it is clear that Anderson was attempting to influence the future actions of a public official.

Anderson concedes that he passed money to Meisch but claims that the payments were simply rewards for past actions and thus gratuities. They were old friends, he argues; Meisch did not do anything he would not have done absent the payment. Anderson's argument, however, suffers from a serious flaw: He focuses exclusively on the payments made to Meisch. Conspicuous by its absence is any reference to the bribe that Anderson and Meisch offered to Rieser. There is no shortage of evidence that the intent of *this* payment was to influence future action; it formed the basis of his § 666 conviction. Meisch approached Rieser immediately before Rieser was set to appear at an important meeting and asked him to vouch for the sufficiency of the offsite detention pond. It makes no difference that the money was not delivered before the action was taken; the intent was to influence Rieser's action. *See United States v. Griffin*, 324 F.3d 330, 366 (5th Cir. 2003). The § 1343 conviction, which involved a telephone call in which this bribe was discussed, was in furtherance of the bribe and shares its corrupt purpose. In short, both convictions involved an attempt to influence official action.

Anderson's argument fails even if we focus on the payments made to Meisch. The sentencing judge found that

these payments were also bribes. Meisch took a series of actions, and he received a series of payments. It is unclear whether the payments were rewards for actions he had already taken or bribes for actions he had not yet taken. But the evidence was even more muddled in *Agostino*, and yet we upheld the district court's factual finding that the conduct at issue involved an attempt to influence future action and was therefore a bribe. *See Agostino*, 132 F.3d at 1195. Anderson conceded at oral argument that a case could be made either for a bribe or for a gratuity. Contrary to what he suggests, this militates against a finding of clear error. *Id*.

This brings us to the rule of lenity. The rule of lenity applies when there are serious ambiguities in the text of a criminal statute. *See, e.g.*, *Moskal v. United States*, 498 U.S. 103, 108, 111 S. Ct. 461, 112 L.Ed.2d 449 (1990). Anderson claims that the rule applies here because an argument could be made for the application of either § 2C1.1 or § 2C1.2. But the rule does not apply when ambiguity is a result of an application of the Guidelines to a particular set of facts; that is, the rule does not apply to factual ambiguities. *See United States v. McEntire*, 153 F.3d 424, 438 & n.16 (7th Cir. 1998). There is nothing ambiguous about § 2C1.1. *See Agostino*, 132 F.3d at 1195; *United States v. Cruzado-Laureano*, 440 F.3d 44, 47 n.8 (1st Cir. 2006). So the rule does not apply here.

## B.  The Calculation of the Benefit Received Under § 2C1.1

We now turn to the most hotly contested issue in this case, which is the proper calculation of the "benefit received" in return for the bribe. *See* U.S.S.G. § 2C1.1(b)(2)

(2003). The bribery provisions base the severity of punishment on the value of the bribe—the more valuable the bribe, the heavier the sentence imposed. *See United States v. Sapoznick*, 161 F.3d 1117, 1118 (7th Cir. 1998). But the value of the bribe is not always the sum offered by the defendant (in this case, $10,000). Instead, § 2C1.1(b)(2) instructs the sentencing judge to use "the value of the payment, the benefit received or to be received in return for the payment, the value of anything obtained or to be obtained by a public official or others acting with a public official, or the loss to the government from the offense, whichever is greatest." U.S.S.G. § 2C1.1(b)(2) (2003). Both parties agree that the value of the "benefit received or to be received" is the proper measure in this case, but they disagree on how it should be calculated.

Anderson fixes the value of the benefit received at $41,131, while the Government fixes it somewhere between $1,000,000 and $2,500,000. Needless to say, these two calculations would have very different ramifications for Anderson's sentence. So what explains the discrepancy? Basically, the dispute in this case is over whether Anderson's offense conduct should include convicted conduct, relevant conduct or both. Anderson believes that his offense conduct involves only the conduct that formed the basis of his conviction—that is, the bribe to Rieser. If Anderson is correct, the only profits included in the benefit calculation would be the profits from Eola Road, because only Eola Road was affected by the bribe to Rieser. The Government, however, does not believe that the bribe of Rieser was a one-time incident; it believes that bribery was Anderson's modus operandi. Thus, it argues that Anderson's offense conduct should include not only the bribe to Rieser but also the payments made by Anderson to Meisch,

which could be found to be bribes for sentencing purposes. These payments affected other properties, such as Grand Pointe Homes and (at least arguably) Misty Creek. Thus, their inclusion would significantly increase the benefit figure.

The Government is correct here, at least in theory. It is well settled that the sentencing judge may consider not only the conduct that formed the basis of the conviction but also "relevant conduct." *See* U.S.S.G. § 1B1.3(a)(2) (2003). Relevant conduct may include "uncharged conduct and even conduct that formed the basis of an acquittal," as long as the judge makes factual findings based on the preponderance of the evidence. *United States v. Schaefer*, 291 F.3d 932, 938 (7th Cir. 2002) (citations omitted). The judge, however, must make sure that the conduct forms a part of the "same course of conduct" or "ongoing series of offenses." U.S.S.G. § 1B1.3 cmt. n.9(B) (2003). Further, we have cautioned that when the benefit calculation is based largely on conduct for which the defendant was not convicted, the district court must be careful to explain exactly how the conduct factors into the benefit calculus. *See Schaefer*, 291 F.3d at 939. We are aware that benefit calculations cannot always be precise, and so we accept reasonable estimates based on the information available in the record. *See* U.S.S.G. 2B1.1(b)(1), cmt. n.3(c) (2003). To be rejected, a district court's calculation must not only be "inaccurate but outside the realm of permissible computations." *United States v. Peterson-Knox*, 471 F.3d 816, 822 (7th Cir. 2006).

Our analysis will thus proceed in three steps. First, we must determine which properties were affected by illegal bribes; only then can we determine which profits should be included in the benefit calculus. *See Sapoznick*,

161 F.3d at 1119 (discussing the "question of causation"). Second, we must determine whether the benefits derived from each of those properties can be reliably calculated and, if so, what those calculations are. *Id*. (discussing the "question of quantification"). Ultimately, we conclude that only Eola Road and Grand Pointe Homes can be included in the benefit calculus; Misty Creek must be excluded. Because the profits from Grand Pointe Homes are impossible to quantify on this record, however, we include only the profits attributable to Eola Road and thus arrive at a benefit figure of only $82,362. We therefore agree with Anderson that the district court erred in its benefit calculation. This raises a third and final question: Was the error harmless? As we will explain, we believe that it was.

1.  *What Properties May Be Considered in the Benefit Calculation?*

Both parties agree that Eola Road must be included in the benefit calculus because the bribe for which Anderson was convicted involved Eola Road. It goes without saying that a sentencing court may consider benefits that flow directly from the counts of conviction. This is undisputed; it is the "relevant conduct" that has created the controversy.

The district court found that the payments made to Meisch for his help with Grand Pointe Homes were acts of bribery that related to the bribe of Rieser. While Anderson insists that the payments were innocent, the record is replete with evidence that suggests otherwise. Anderson, Meisch and Zirk all testified that Anderson had paid Meisch money for his assistance with the Grand Pointe Homes project. Meisch would apply influence on behalf

of Anderson, and Anderson's problems would conveniently disappear. The district court knew that Anderson was highly sophisticated; this was evident from his dealings with Rieser. It was thus reasonable for the district court to conclude that Anderson either had bribed Meisch or had given Meisch money so that he could bribe the apropriate officials (as had been done with Rieser). It is also clear that Grand Pointe Homes benefitted from these bribes. Anderson turned to Meisch just as the project stalled in the City Council. Without Meisch's intervention, the project may never have been approved. With Meisch's help, it was not only approved, but approved with an even greater density than the original plan. Thus, the profits attributable to the project can be included in the benefit calculation.

But even if the payments Anderson made to Meisch can be considered as relevant conduct, they cannot be connected to Misty Creek. Indeed, we could find only two pieces of evidence in the entire record that linked Misty Creek to these bribes: Misty Creek was mentioned at the first breakfast meeting between Meisch and Anderson in 2001, and Anderson admitted to the FBI that he had given Meisch a flatbed truck in the early 1990s for his assistance with Misty Creek. Neither of these facts was relied upon, or even mentioned, by the district court. There was no evidence to show that the Misty Creek project had encountered obstacles that would have required Meisch's assistance; thus, we have no way to know what Meisch could have done to assist the project. Misty Creek was basically completed by the time of the earliest alleged bribes; the construction of homes was already well underway at that point. Even the district court judge seemed to accept Anderson's arguments on this

point. Sentencing H'rg Tr.167. Misty Creek must be excluded.

### 2. *What is the Proper Net Benefit Calculation?*

We have made our preliminary determination: Eola Road and Grand Pointe Homes are to be included in the benefit calculus; Misty Creek is out. We must now calculate the benefit Anderson derived from these two properties. Because more than 90% of the district court's net benefit figure reflects benefits derived from relevant conduct, we will scrutinize the numbers more closely. *See Schaefer,* 291 F.3d at 939.

The intended benefit from the Eola Road bribe is clear: It is the market value of the land Anderson saved from the set-aside. Anderson argued that, because the property was eventually developed with a 9.45% set-aside, the intended benefit was 9.45% of the value of his share of the property. Anderson placed this value at $41,181 and the district court agreed. Anderson, however, made a simple mathematical mistake. Even if we accept Anderson's methodology, the net benefit figure is at least $82,362, or twice the amount he claims. Anderson owned an undivided half-interest in Eola Road and *his share* of the property sold for $871,564. This figure should have been multiplied by 0.0945 but, instead, Anderson suggested that it be multiplied by 0.04725 to reflect his half-interest in the property. Sentencing H'rg Tr.167. Dividing the set-aside percentage in half was the equivalent of discounting Anderson's ownership interest twice. The net benefit from Eola Road should have been at least $82,362.

In the end, however, Eola Road accounted for only a small fraction of the total benefit calculation. The vast

majority of the calculated benefit figure was composed of profits that Anderson made from Grand Pointe Homes. The Government estimated that Anderson had earned nearly $1.1 million from Aurora LLC, the company created by Anderson and Pelock to develop Grand Pointe Homes and Misty Creek.[2] We have concluded, however, that Misty Creek should be excluded from the calculus. This creates a serious dilemma because neither the Government nor Anderson submitted any evidence establishing the amount of profit that Misty Creek generated in contrast to Grand Pointe Homes. Apparently, in a crude effort to separate the profit on one project from the profit on the other, the district court said that it would "discount[ ] some aspects of Misty Creek." Sentencing H'rg Tr.164-165. But there has been no reasonable basis presented for calculating the value of Misty Creek on the basis of a discount. One might assume that the profits contributed by Grand Pointe Homes and Misty Creek were roughly equal but Misty Creek may have been more profitable than Grand Pointe Homes. Grand Pointe Homes may even have lost money. On this record, we do not know. *See Sapoznick*, 161 F.3d at 1119 ("[T]here is nothing in the record to fill the void in our knowledge."). This is a rare occasion in which the district court's calculation is "outside the realm of permissible calculations." *Peterson-Knox*, 471 F.3d at 822; *accord Gall*, 128 S. Ct. at 597-98; *United States v. Rodriguez-*

---

[2] The Government estimated that Anderson had received approximately $7.1 million from Aurora LLC. This included cash distributions, future profits, and interest paid on Anderson's behalf. The Government subtracted from these proceeds the $6 million in real estate that Anderson had invested in Aurora LLC and concluded that the benefit received from the two projects was $1.1 million.

*Alvarez*, 425 F.3d 1041, 1045-46 (7th Cir. 2005); *United States v. Skoczen*, 405 F.3d 537, 549 (7th Cir. 2005). So we cannot determine a benefit attributable to Grand Pointe Homes and the total determinable benefit is limited to Eola Road.

### 3.  Was the District Court's Error Harmless?

We have found that the district court erred in its calculation of the benefit received. Before we remand the case, however, we must determine whether the error was harmless. *See e.g.*, *United States v. Saunders*, 129 F.3d 925, 932-33 (7th Cir. 1997). An error is harmless if it "did not affect the district court's selection of the sentence imposed." *Williams v. United States*, 503 U.S. 193, 203, 112 S. Ct. 1112, 117 L.Ed.2d 341 (1992). So, knowing what we now know, would the district court have selected the same sentence? There is no need for speculation here. The district court stated explicitly at the sentencing hearing that it believed that seventy-two months was the reasonable sentence under § 3553(a), even if its benefit calculations were incorrect: "I will say for purposes of any appeal, the rulings I have made in applying the sentencing guidelines—and I think I have made a good faith basis [sic] to do that—in the alternative I would reach the conclusion that the six-year sentence is the reasonable sentence under 18 U.S.C. 3553, if another judge determines that my sentencing guidelines calculations were in any way made in error." Sentencing H'rg Tr.184. Such "blanket" sentences may create problems in certain circumstances, but alternative holdings can prevent needless remands when district judges are faced with technical Guidelines calculations but where there are other Guidelines justifications. *See United States v. Williams*, 431 F.3d 767, 773-76 (11th Cir. 2005) (Carnes, J., concurring). Here, as we shall see, the district

court would be justified for other reasons in imposing the same sentence in this case.

On remand, the district court would be required to apply the *current* version of the Guidelines. *See Demaree*, 459 F.3d at 795. The original sentencing took place in April 2006 but the court used the November 2003 version of the Guidelines. The sections of the Guidelines at issue in this case were subject to important amendments in November 2004 that made the penalties much more severe. As discussed above, the benefit received in this case was at least $82,362. This figure, which may have seemed much less significant under the 2003 Guidelines, creates a much stiffer sentencing range under the amended Guidelines. The calculation under the new Guidelines would be as follows: Anderson's base offense level would be twelve. *See* U.S.S.G. § 2C1.1(a)(2) (2007). Two levels would be added for multiple bribes under § 2C1.1(b)(1). Four levels would be added because Rieser was a "public official." *See* U.S.S.G. § 2C1.1(b)(3) (2007). Finally, using our adjusted net benefit of $82,362, eight levels would be added for a net benefit of more than $70,000. Anderson's total offense level would be twenty-six, which would yield a range of sixty-three to seventy-eight months. This is the same range the district court originally used, so the district court would be free to impose the same sentence on remand. Because it has clearly stated its intention to do so, any error in the calculation of the sentencing range was harmless.[3]

---

[3] Although the Government believes that the district court underestimated the benefit received, it did not cross-appeal the sentence.

**C. The Reasonableness of the Sentence Under Section 3553(a)**

Because the district judge would apply the same sentence, we now ask only whether it is a reasonable one. When the sentence falls within the Guidelines range, it is presumed reasonable. *See United States v. Mykytiuk*, 415 F.3d 606, 608 (7th Cir. 2005). Ultimately, however, the reasonableness of a sentence is determined in light of the § 3553(a) factors. *See Gall*, 128 S. Ct. at 596-97. Of course, the judge does not have to "write a comprehensive essay applying the full panoply of penological theories and considerations." *United States v. Dean*, 414 F.3d 725, 729 (7th Cir. 2005). We find the sentence in this case to be reasonable.

The district court referred to a number of recent public corruption scandals, both in Illinois and elsewhere. *See* 18 U.S.C. § 3553(a)(2)(A) (2007). The judge stressed the corrosive effect that corruption has on the public trust and expressed his belief that the scandals will not end unless they are treated "appropriately hard." Anderson believes that the judge put too much weight on the public corruption scandals, but the judge was simply emphasizing the seriousness of the nature of the crime and discussing the need for general deterrence. *See* 18 U.S.C. § 3553(a)(2)(B) (2007). The district court also believed that Anderson had engaged in bribery before; thus, there was also a need for specific deterrence. *See* 18 U.S.C. § 3553(a)(2)(C) (2007). The judge did acknowledge the defendant's advanced age but this factor also may have worked against Anderson. The judge noted that Anderson was well off financially and could have relaxed and enjoyed his golden years. While many criminals commit crimes from lack of opportunity and desperation, Ander-

son had acted out of greed. Nevertheless, the judge refused to give a sentence in the higher end of the Guidelines range because Anderson is seventy-three years old and suffers from a serious kidney disease. *See* 18 U.S.C. § 3553(a)(1) (2007). Given this explanation, we believe the sentence is reasonable and we will not disturb it on appeal.

### IV. CONCLUSION

Because we find that the sentence was reasonable and that any error in the calculation of Anderson's Guidelines range was harmless, the decision of the district court is AFFIRMED.