**UNITED STATES of America, Appellee,**

v.

**Philip STANLEY, Defendant–Appellant.**

**No. 130, Docket 93–1086.**

United States Court of Appeals, Second Circuit.

Argued Sept. 1, 1993.

Decided Dec. 15, 1993.

Kevin P. Candon, Rutland, VT, for defendant-appellant.

Gregory L. Waples, Asst. U.S. Atty., D. Vermont (David V. Kirby, Chief, Crim. Div., D. Vermont, Charles A. Caruso, U.S. Atty., D. Vermont, of counsel), for appellee.

Before: FEINBERG, CARDAMONE, and ALTIMARI, Circuit Judges.

ALTIMARI, Circuit Judge:

Defendant-appellant Philip Stanley appeals from a judgment entered on January 25, 1993 after a jury trial in the United States District Court for the District of Vermont

(Billings, *J.*), convicting him of one count of bank fraud in violation of 18 U.S.C. § 1344, one count of mail fraud in violation of 18 U.S.C. § 1341, one count of causing false entries to be made in bank records in violation of 18 U.S.C. § 1005, and one count of making false statements in violation of 18 U.S.C. § 1001. Stanley was sentenced to serve four concurrent terms of 34 months' imprisonment, followed by a three-year term of supervised release, and payment of restitution in the amount of $509,200.

On appeal, Stanley challenges both his conviction and his sentence. Regarding his conviction, Stanley challenges the facial sufficiency of the indictment and the sufficiency of the evidence at trial. Stanley also claims that the district court improperly instructed the jury and asserts that he was the victim of prosecutorial misconduct. Regarding his sentence, Stanley contends that the district court erred in calculating the amount of loss attributable to his fraud under the Sentencing Guidelines.

For the reasons set forth below, we affirm the conviction, but vacate and remand for resentencing.

## BACKGROUND

In 1987, Stanley was hired as the Trust Investment Officer at Merchants Trust, a trust company serving about 600 clients. Stanley's principal responsibility at Merchants Trust was to oversee and manage $200 million in assets that the bank invested on behalf of its trust clients. As part of his duties, Stanley had the authority to make investment decisions on behalf of the trust clients who had delegated discretionary investment authority to the bank.

In mid-September 1989, Stanley bought $485,000 worth of $100 par value bonds of the Bank of New England ("BNE") bearing an interest rate of 9.5% with a maturity date of February 15, 1996. Seven weeks later, in early November, he purchased an additional $855,000 worth of the same issue of bonds. The bonds were purchased on behalf of about forty trust clients.

In late November 1989, the public began to learn about an alarming deterioration in the BNE's financial condition. This perception began to affect the value of the BNE bonds purchased by Stanley, as Standard & Poor's reduced its rating of the bonds from A– to BBB. On December 15, 1989, the bonds were downgraded to BB, and on January 19, 1990 they fell to B+.

As the rating of the BNE bonds Stanley purchased for Merchants Trust customers fell, the market price of those bonds deteriorated in a corresponding way. On November 30, 1989, each $100 par value bond had a market price of about $99.75. Thereafter, the market began to spiral downward, and by December 22, 1989, according to the national pricing service to which Merchants Trust subscribed, the price had fallen to about $67 per bond. By the end of December, the price of the bonds recovered slightly to about $72. In January, the price of the bonds plunged to a low of $12 before rising to about $34 at the end of February.

Merchants Trust customers received periodic summaries of the investment activity in their trust portfolios. In order to compile accurate account valuation information for each reporting period, Merchants Trust subscribed to Interactive Data Service, Inc. ("IDSI"), the largest pricing service in the country and a subsidiary of Dun & Bradstreet. Early each month, IDSI sent Merchants Trust the price, determined as of the close of business at the end of the preceding month, for each of about 900 securities the bank held in its customers' portfolios. Merchants Trust then loaded the IDSI data into its computer, which in turn generated printouts of individual customer statements. Stanley and other account administrators reviewed the statements for accuracy before they were mailed to trust clients.

John Savage, the Operations Officer of Merchants Trust, was responsible for generating the customer statements. In early January 1990, before the December 1989 statements were mailed to clients, Stanley approached Savage to discuss the pricing of the BNE bonds. Savage had already printed statements that reflected a BNE bond price of $72, the valuation reported to Merchants Trust by IDSI. Stanley told Savage, who was not an investment analyst, that the IDSI

price for the BNE bonds was in error and that the BNE bond price in Merchants Trust's printed statements should be changed to $98. There is some indication in the record that the statements calculated with the altered figure were subsequently mailed to about thirty-four of the bank's clients whose portfolios contained BNE bonds ("the January mailing").

According to government witnesses, Stanley had never before questioned IDSI's pricing of a security, and only once had Merchants Trust previously altered the IDSI pricing on a customer statement. Despite this, at the end of January, when IDSI priced the security at $23 for the previous month, Savage conferred with Stanley about the market value that should be assigned to the bonds when the customer statements were printed. Stanley again persuaded Savage to elevate the price reported in the account statements to $85. There is some indication in the record that in early February 1990 those statements were only mailed to approximately seven of the customers whose portfolios contained BNE bonds, rather than to all of the approximately forty clients for whom Stanley had purchased the BNE bonds ("the February mailing").

In early March, Savage noted that the IDSI price for the BNE bonds was again severely depressed at $34. This time, despite Stanley's urging that the value was inaccurate, Savage refused to alter the price without the approval of Susan Moses, the President of Merchants Trust. Savage informed Moses that Stanley wanted him to change the IDSI price for the bonds, but Moses instructed both Savage and Stanley that the bank would not deviate from the IDSI valuation in preparing the February statements. Despite this, Stanley went to the Operations Office and attempted to persuade Savage's assistant, Susan Paris, to inflate the price on her own. Paris refused, and in March 1990 Merchants Trust's clients received an accurate accounting of the BNE portfolios, showing that the bond had lost approximately two-thirds of its worth in four months. In the wake of the revelation, and because of complaints from its clients, Merchants Trust redeemed all of the BNE bonds

for all of its clients at full par value. Merchants Trust eventually sold these bonds for a price of about $27. The bank and its insurance carrier absorbed the loss—the difference between the final sale price and the redemption price—which amounted to over $900,000.

On December 19, 1991, a grand jury returned a seven-count indictment against Stanley. Counts I and II charged Stanley with using the mails to defraud Merchants Trust clients of truthful pricing information about the value of the BNE bonds in violation of 18 U.S.C. § 1341. Count I related to the January mailing, and Count II pertained to the February mailing. Count III charged Stanley with committing bank fraud in violation of 18 U.S.C. § 1344. Counts IV and V charged that Stanley caused false entries to be made in bank records in violation of 18 U.S.C. § 1005. Counts VI and VII charged Stanley with making false statements in violation of 18 U.S.C. § 1001. Counts IV and VI corresponded to the January mailing, and Counts V and VII related to the February mailing.

Stanley's trial commenced on July 8, 1992. At trial, Stanley's main defense was that he lacked the criminal intent to defraud or to deceive. He claims that he had a genuine, good faith belief that the valuations he had substituted into the customer statements were more accurate assessments of the bonds' value than the IDSI price quotations. Two government witnesses, however, provided evidence that Stanley knew that the bond prices he caused to be inserted into the statements did not accurately reflect the BNE bonds' value. At the close of the evidence, the jury acquitted Stanley on the three counts which corresponded to the January mailing, but convicted him on the four counts which corresponded to the February mailing.

Following the verdict, the Probation Department prepared a Presentence Report ("PSR") for Stanley which recommended a base offense level of six. *See* U.S.S.G. § 2F1.1(a). The PSR recommended an increase in the base level by ten because it concluded that Stanley's fraudulent conduct had caused Merchants Trust and its insur-

ance carrier to suffer a loss of between $500,-000 and $800,000. *See* U.S.S.G. § 2F1.1(b)(1)(K). The PSR also recommended an additional four levels because the offense conduct involved more than minimal planning, *see* U.S.S.G. § 2F1.1(b)(2), and because Stanley had abused a position of private trust, *see* U.S.S.G. § 3B1.3. Finally, the PSR concluded that Stanley obstructed justice by attempting to induce a witness to commit perjury at his trial and recommended a two-level upward adjustment. *See* U.S.S.G. § 3C1.1. The PSR denied him credit for acceptance of responsibility. *See* U.S.S.G. § 3E1.1. Accordingly, the PSR recommended a total offense level of 22.

At the sentencing hearing, the district court accepted the findings of the PSR with respect to the calculation of loss, acceptance of responsibility, abuse of position of trust, and more than minimal planning. The district court did not accept the recommendation of the PSR for a two-level enhancement for the obstruction of justice. This resulted in a total offense level of 20 and a criminal history category of I, resulting in a sentencing range of 33 to 41 months. Stanley was sentenced to four concurrent terms of 34 months' imprisonment, followed by a three-year term of supervised release, and payment of restitution in the amount of $509,200.

Stanley now appeals.

## DISCUSSION

On appeal, Stanley contests both his conviction and his sentence. We have examined all of Stanley's challenges to his conviction and find them to be meritless. We discuss only Stanley's challenge to his sentence. Stanley contends that the district court erred in its calculation of the value of loss caused by Stanley's actions, and thereby improperly increased his base offense level by ten levels pursuant to U.S.S.G. § 2F1.1(b)(1)(K). We agree.

We review the district court's application of the Sentencing Guidelines *de novo* and the district court's findings of fact for clear error. *See United States v. Deutsch,* 987 F.2d 878, 884–85 (2d Cir.1993) (citation omitted).

■ In the instant case, the district court ascertained that Stanley's alteration of the BNE pricing information caused a loss to Merchants Trust in excess of $500,000. This was based on finding Stanley accountable for the loss between the value of the bond in early January 1990 (about $72), when Stanley's fraudulent scheme commenced, and the value of the bond when the fraud was first discovered in March 1990 (about $34). Recognizing that even a prudent and vigilant trust investment officer probably would not have foreseen the precipitous decline that the bonds' value would undergo, the district court did not attempt to hold Stanley accountable for any drop in the bonds' value that occurred before he first tried to conceal the deteriorating price from the bank and its customers. The court did, however, properly consider the January mailing for relevant conduct. *See United States v. Rodriguez–Gonzalez,* 899 F.2d 177, 181 (2d Cir.) ("permitting sentence enhancement on the basis of acquitted conduct"), *cert. denied,* 498 U.S. 844, 111 S.Ct. 127, 112 L.Ed.2d 95 (1990).

■ Stanley now argues, among other things, that the district court's evaluation of loss was improperly based on the entire loss of the bonds held by all customers even though the evidence showed that not all customers holding the BNE bonds had received statements with the altered IDSI prices. He contends that even though most of the customers received the altered statements in the January mailing, as they were year-end statements, only a fraction of the customers received the fraudulent pricing in the February mailing. Stanley claims that although he may be responsible for the loss suffered by the bank customers who received the fraudulent statements, if a bank customer did not receive such a statement, then that customer's share should not have been used in calculating the loss. Thus, he argues that the district court erred when it failed to consider this factor in its calculation of the amount of loss attributable to his fraudulent actions.

Section 2F1.1 (Fraud and Deceit) of the Guidelines calls for an adjustment to the base offense level depending on the amount of loss. The Commentary to § 2F1.1 dis-

cusses the calculation of loss in the context of larceny, embezzlement, and other forms of theft, and notes that "if an intended loss that the defendant was attempting to inflict can be determined, this figure will be used if it is greater than the actual loss." U.S.S.G. § 2F1.1, comment. (n. 7).

Under the Guidelines, loss "may consist of the 'probable' loss resulting from the fraud." *United States v. Brach*, 942 F.2d 141, 143 (2d Cir.1991) (citing *United States v. Haddon*, 927 F.2d 942, 951–52 (7th Cir.1991) and *United States v. Davis*, 922 F.2d 1385, 1392–93 (9th Cir.1991)). Further, " 'loss' within the meaning of the Guidelines includes intended, probable, or otherwise expected loss." *United States v. Lohan*, 945 F.2d 1214, 1219 (2d Cir.1991) (quoting *United States v. Schneider*, 930 F.2d 555, 558 (7th Cir.1991)).

In the present case, the court arrived at its loss calculation by considering the loss to all the customers holding the BNE bonds. We find this determination problematic for two reasons. First, assuming that the court's calculation was based on an assumption that the loss to all the customers constituted the *actual loss* resulting from Stanley's fraudulent representations, we are troubled by indications in the record that not all the customers holding the BNE bonds received the fraudulent information. If only about thirty-four of the bank's customers received the January mailing and only about seven of the bank's customers received the February mailing, then only the loss attributable to those customers may be considered for purposes of determining actual loss.

Second, assuming that the district court's loss calculation was instead based on an assumption concerning the *intended loss,* an amount which if greater than the actual loss will control for purposes of computing the loss, *see* U.S.S.G. § 2F1.1, comment. (n. 7), we are troubled by the lack of any finding that Stanley intended to defraud all of the approximately forty trust clients. Without that finding, it is possible that Stanley only intended to defraud those clients that he believed would actually receive the fraudulent information.

In sum, because the district court failed to indicate whether its loss calculation was based on actual or intended loss, and failed to make sufficient factual findings supporting either calculation, we remand for resentencing. If upon reconsideration, the district court's sentencing calculation results in a determination of loss different from that originally found, the district court may wish to also recalculate the amount of restitution and make findings as to that issue. We have examined Stanley's remaining contentions regarding his sentence and find them to be without merit.

### CONCLUSION

Based on the foregoing, we affirm defendant's conviction, but vacate and remand this case for further sentencing proceedings consistent with this opinion.