In the

# United States Court of Appeals
## For the Seventh Circuit

No. 06-4140

RIDGE CHRYSLER JEEP, LLC, and SALES, INCORPORATED,

*Plaintiffs-Appellants*,

*v.*

DAIMLERCHRYSLER FINANCIAL SERVICES AMERICAS LLC,

*Defendant-Appellee*.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 03 C 760—**Virginia M. Kendall**, *Judge*.

ARGUED SEPTEMBER 21, 2007—DECIDED FEBRUARY 20, 2008

Before EASTERBROOK, *Chief Judge*, and KANNE and ROVNER, *Circuit Judges*.

EASTERBROOK, *Chief Judge*. Ridge Chrysler Jeep and Dodge of Midlothian were dealers in Chrysler's vehicles. It provided floor-plan financing and was entitled by contract to withdraw or limit financing if its position became insecure. (We refer to "Chrysler," which before its spinoff into Chrysler LLC was a division of DaimlerChrysler. Financing was by DaimlerChrysler Financial Services, which survived the separation of Chrysler from Mercedes Benz.)

In 2002 Chrysler exercised its right to require the dealerships to pay up front for their inventory. They

responded with this suit under the Automobile Dealers' Day in Court Act, 15 U.S.C. §§ 1221–25, accusing Chrysler of effectively ending the franchises without adequate cause. Chrysler replied that it remained willing to furnish whatever the dealerships could resell; if they could not pay in advance they were free to obtain capital from the many other firms that specialize in loans secured by inventory.

After Gerald Gorman, the CEO and principal owner of the two dealerships, represented that he had been unable to obtain third-party credit, District Judge Andersen entered an interlocutory order compelling Chrysler to continue to finance the inventory, provided that Gorman raise new capital to improve Chrysler's position. Once Gorman filed an affidavit verifying that he had secured $925,000, the district judge's order took effect. Despite Fed. R. Civ. P. 65(c), the judge did not require the dealerships to give an injunction bond or other security, and Chrysler neglected to take an appeal from that omission. It has had cause to regret both the district court's oversight and its own inaction. See *W.R. Grace & Co. v. Rubber Workers*, 461 U.S. 757, 770 n.14 (1983); *Mead Johnson & Co. v. Abbott Laboratories*, 201 F.3d 883, 887–88, amended, 209 F.3d 1032 (7th Cir. 2000).

Discovery then got under way. The case was complex, because the dealerships made claims under state law and also argued that Chrysler had discriminated by refusing to finance the purchases of non-suburban black customers. For its part, Chrysler filed counterclaims seeking repayment of outstanding loans. Discovery was sidetracked once Chrysler learned that Gorman had lied to Judge Andersen. The supposed $925,000 in new equity was in fact a $750,000 loan from Edward Vrdolyak, then the dealerships' lawyer in this suit. The loan was secured by some of Midlothian's inventory and so did not provide Chrysler with a cushion, as Gorman had represented.

The other $175,000 appeared to represent Gorman's sale of his shares in firms unrelated to the dealerships. Changing some of Gorman's existing assets from stock to cash did nothing to improve Chrysler's security.

Chrysler sought to discover the dealerships' business records, many of which were on a computer. First plaintiffs denied having any such computer; then they said that they could not access it after the dealerships closed in late 2003; by the time Magistrate Judge Keys ordered the dealerships to comply, the computer had been repossessed and destroyed by its owner. Gorman had failed to copy the data for disclosure to Chrysler. (The facts we are reciting come from Magistrate Judge Keys's findings, which District Judge Kendall approved after the case was transferred to her.)

The magistrate judge also found that Gorman had lied about his efforts to obtain loans from sources other than Chrysler. Gorman assured Judge Andersen that he had made personal inquiries and found banks unwilling to lend because of the pending litigation; in a deposition, however, Gorman conceded that he had not tried to obtain floor-plan financing from anyone other than Chrysler until after the district court entered its order. (Whether Gorman's representations should have led to any relief, had they been true, is open to doubt. Suppose that no one other than Chrysler was willing to finance the dealerships' inventory at any plausible interest rate. That judgment of independent financiers would establish, not that Chrysler should be compelled to loan more, but that it had good business reasons for thinking itself insecure.)

Plaintiffs' verified complaint asserted that the allegations of racial discrimination by Chrysler could be established by contemporaneous notes that Gorman had maintained. During discovery plaintiffs were unable to produce these notes. Whether they never existed, or existed

but were destroyed to prevent revelation of their contents, is unknown.

To top this off, Gorman used the time when Chrysler was an involuntary creditor to pay himself $1 million of a loan to the dealerships that was supposed to be subordinated to Chrysler's position. Thus the promised $925,000 in new capital (which actually was no more than $750,000) was offset by a loss of $1 million in old capital. Gorman's "explanation" for this is that he deemed the subordination agreement to be invalid. He didn't tell Chrysler about this view, or his action based on it, until he had been caught. As far as we can see, Gorman has never attempted to establish that the subordination agreement *is* invalid; he treats his unilateral belief as sufficient to justify going back on his word to both Chrysler and Judge Andersen.

When the dealerships closed, they owed Chrysler $4 million, about $500,000 more than when this litigation began. The district court ordered the dealerships to pay that debt on Chrysler's counterclaim, and it dismissed the dealerships' claims as a sanction for misconduct during the course of the litigation. 2006 U.S. Dist. LEXIS 63664 (N.D. Ill. Sept. 6, 2006). Only the dismissal for misconduct is at issue on this appeal. Whether Chrysler will be able to recover much of the money that the district court ordered it to loan the dealerships without the security required by Rule 65(c) is uncertain.

Findings of fact must stand unless clearly erroneous, and a district judge's decision that a party's misconduct is serious enough to justify dismissal with prejudice is reviewed for abuse of discretion. *National Hockey League v. Metropolitan Hockey Club, Inc.*, 427 U.S. 639 (1976). The limited scope of appellate review puts the dealerships behind the eight ball. They try to lighten their load by arguing that there is a strong presump-

tion against dismissal as a sanction, and that only "clear and convincing evidence" can support outright dismissal. Although one recent opinion in this circuit uses a "clear and convincing evidence" standard, see *Maynard v. Nygren*, 332 F.3d 462, 468 (7th Cir. 2003), we have observed more recently that *Maynard* failed to discuss *Grogan v. Garner*, 498 U.S. 279 (1991), and *Herman & MacLean v. Huddleston*, 459 U.S. 375 (1983), which hold that heightened burdens of proof do not apply in civil cases unless a statute or the Constitution so requires. See *Wade v. Soo Line R.R.*, 500 F.3d 559, 564 (7th Cir. 2007). Neither a statute nor the Constitution requires an elevated burden for dismissal as a sanction, when the burden in the underlying suit is the preponderance of the evidence. But we need not decide today whether the time has come to overrule *Maynard*, as the district court's findings suffice on any standard.

The dealerships' appellate arguments are uniformly unconvincing. They lead with the contention that the loan from Vrdolyak was to Gorman personally, not to Midlothian. This is unhelpful if true, for Gorman assured Judge Andersen that he had raised new equity capital. His affidavit says, among other things, "The source of the capital investment was not a loan from a third party that would require payment from dealership assets." But that is false. The record contains a note showing Midlothian as the borrower and grantor of security in its inventory. Vrdolyak wrote his check to Midlothian, and the money was deposited to a corporate account. Gorman says that he and Vrdolyak later agreed orally that the money would be treated as an unsecured loan to Gorman, but Vrdolyak himself did not agree. In a deposition, Vrdolyak testified that Midlothian is the obligor on the note and Gorman a guarantor. Faced with a conflict between the written word and Gorman's uncorroborated assertion, it can't be clearly erroneous for the judge to

prefer the writings. Especially when Gorman's testimony was undermined by the fact that Midlothian paid Vrdolyak $10,000 a month after the loan was made. Gorman has no explanation for these payments other than the inference that the district judge drew—that they are debt service on a loan.

Now consider the question whether Gorman lied to Judge Andersen about his efforts to obtain floor-plan financing. Gorman conceded during his deposition that he did not try to obtain such credit until after Judge Andersen entered his interlocutory order. When the consequences of this statement—it confesses to perjury in the affidavit filed with Judge Andersen—became clear, Gorman filed another affidavit taking another tack. The district court didn't have to buy the latest story. Nor was the district court obliged to interpret a banker's equivocal statement that he "could have" met Gorman before the court entered interlocutory relief as proof that Gorman *did* ask for a loan then. The banker added that his institution was too small to finance the dealerships' inventory. Midlothian needed $10 million in credit, and this bank's lending limit was $1.85 million. Gorman did not tell Judge Andersen that his requests for credit had been turned down because he approached lenders without the requisite capacity. Making a request that is certain to be rejected, for reasons unrelated to the probability of repayment, is not a good-faith effort to replace Chrysler's financing; Gorman might as well have asked one of his children for a loan. So even by Gorman's latest version his affidavit at the outset of this suit was misleading.

It is unnecessary to discuss any of the other aspects of Gorman's chicanery, though they too are supported by adequate findings.

As for the sanction: we have held that the penalty must be proportionate to the wrong, see *Ball v. Chicago*, 2 F.3d

752 (7th Cir. 1993), but this does not assist the dealerships. The principal wrong identified by the district court—deceiving Judge Andersen to obtain an order worth at least $500,000 to the dealerships—show that this suit entails an abuse of the federal court's process. One who misuses litigation to obtain money to which he is not entitled is hardly in a position to insist that the court now proceed to address his legitimate claims, if any there are. Plaintiffs insist that the claims of racial discrimination are legitimate, but that is dubious. The complaint and appellate brief narrate repugnant events, but when the time came in discovery to produce the notes that supposedly recorded the discriminatory statements by Chrysler's employees, the notes were nowhere to be found. Plaintiffs have behaved like a pack of weasels and can't expect any part of their tale be believed. Anyway, discrimination against would-be purchasers of cars is actionable by the persons discriminated against. A suit by persons claiming to be the victims of discriminatory failure to make loans has been filed and settled. *Coburn v. DaimlerChrysler Services North America, LLC*, No. 03 C 759 (N.D. Ill.). The dealerships are only incidental losers (if discrimination occurred at all), and this suit need not be kept alive on that account.

AFFIRMED

A true Copy:

　　　Teste:

_____
*Clerk of the United States Court of Appeals for the Seventh Circuit*

USCA-02-C-0072—2-20-08