In the

# United States Court of Appeals

### For the Seventh Circuit

No. 09-1891

UNITED STATES OF AMERICA,

*Plaintiff-Appellant*,

*v.*

EDWARD R. VRDOLYAK,

*Defendant-Appellee*.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 07 CR 298—**Milton I. Shadur**, *Judge*.

ARGUED DECEMBER 10, 2009—DECIDED JANUARY 29, 2010

Before POSNER, MANION, and HAMILTON, *Circuit Judges*.

POSNER, *Circuit Judge*. Edward Vrdolyak pleaded guilty to conspiracy to commit mail and wire fraud and agreed in the plea agreement that the loss intended by his fraud was between $1 million and $2.5 million. He was sentenced to five years of probation, with a community-service obligation but no confinement, and to pay a $50,000 fine (a modest amount, because the defendant has a high income, and a net worth in excess

of $1 million if his large loans to members of his family are included). The government appeals, contending that the judge miscalculated the sentencing-guidelines range applicable to the defendant's crime and committed other errors. Although a judge is no longer required to give a guidelines sentence, he is required to make a correct determination of the guidelines sentencing range as the first step in deciding what sentence to impose. *Gall v. United States*, 552 U.S. 38, 50 (2007); *United States v. Gibbs*, 578 F.3d 694, 695 (7th Cir. 2009).

The Chicago Medical School (as it was then known) wanted to sell a property in Chicago that it owned consisting of a lot with a building on it. Stuart Levine was a trustee of the medical school and the chairman of the board's real estate committee, and he agreed with the defendant to use his position as a trustee to steer the sale of the property to a buyer of the defendant's choice. The defendant lined up Smithfield Properties to be the favored buyer in exchange for a $1.5 million fee that Smithfield agreed to pay him, and he in turn agreed to give Levine half the fee. The medical school was not told about this corrupt arrangement. Levine like the defendant has pleaded guilty to his part in the fraud and has agreed not to contest a prison sentence of up to 67 months that the sentencing judge might impose.

Smithfield's initial offer for the building—$9.5 million—was lower than two other potential buyers—the Farley Group and Loyola University—were willing to pay. The defendant advised Smithfield to up its offer, and it did, to $15 million. Farley and Loyola remained inter-

ested in buying the property. To head them off, Levine arranged for an "emergency" meeting of the medical school's board of trustees to consider offers for the property. At the meeting, although Farley had offered $15 million and Loyola $15.5 million for the property, the board, persuaded by Levine, decided to accept Smithfield's offer and negotiate no further with Farley or Loyola. The board discounted Loyola's bid because Loyola had not actually inspected the property before bidding—Levine had seen to that. The board rejected Farley's bid because Levine strongly urged approval of Smithfield's bid, noting that Farley's was lower because it included a 4 percent brokerage fee that would be deducted from the amount paid to the school. This was misleading, because Smithfield's bid was contingent on obtaining zoning approvals and Farley's was not. And a week later Farley upped its bid to $16 million, which in pure dollar terms was higher than Smithfield's even after deduction of the brokerage fee. Farley was told that it was too late.

The government was prepared to offer an affidavit from Loyola's broker that Loyola would have increased its offer had it been given an opportunity to do so. And a representative from Farley was prepared to testify that if necessary Farley would have increased its offer to somewhere between $18 and $20 million. By convening the emergency meeting Levine had made sure that Smithfield's bid would be accepted and that he and the defendant would split the finder's fee. Although we use "bid" and "bidder" as synonyms for "offer" and "offeror,"

no formal auction was ever contemplated and so there was no reason to consider Farley's higher bid untimely.

The district judge concluded that the defendant's fraud had inflicted neither actual nor intended loss on the medical school. His finding that it had inflicted no actual loss was based on the fact that Smithfield's bid was the highest one considered at the "emergency" meeting. The judge gave no weight to Farley's week-later offer of $16 million and refused to consider the evidence that Farley would have bid $18 million to $20 million if given the chance and that Loyola was also prepared to offer more than $15.5 million. These rulings were erroneous. No emergency required the medical school's board of trustees to act with haste to award the sale contract. The "emergency" was a ruse to preclude competition with Smithfield.

The judge's refusal to consider the evidence of what Loyola or Farley would have done if given the chance to sweeten their bids was based on his belief that uncommunicated intentions are unworthy of consideration by a finder of fact. That is not correct. No rule of evidence or principle of common sense makes a person's testimony about his own intentions—testimony uniquely based on his personal knowledge—inadmissible in a sentencing proceeding any more than in any other proceeding in which intention is material. *United States v. Young*, 247 F.3d 1247, 1252–53 (D.C. Cir. 2001). Who better than a potential buyer knows what he would bid for a property?

The judge himself speculated at the sentencing hearing about the defendant's uncommunicated intentions in

conspiring with Levine to defraud the medical school—
that he had acted out of friendship for Levine. A defen-
dant's testimony about his uncommunicated intentions
is no more credible than the testimony of an honest
third party about *his* uncommunicated intentions. To
believe the former and refuse even to listen to the
latter is error.

The weight to be given a piece of evidence is one thing,
and is ordinarily within the discretion of the trier of fact
to determine. Admissibility is another matter. A judge
is not permitted to have his own rules of admissibility—to
say for example that "[i]n my court no exceptions to the
hearsay rule will be recognized." As we shall be empha-
sizing throughout this opinion, our concern is not with
the leniency of the defendant's sentence as such but
with procedural errors committed by the judge en route
to the determination of the sentence.

The judge's refusal to listen to the evidence of the
potential buyers was an egregious error because the
evidence was corroborated. The medical school's
property had recently been appraised for $15 million on
the assumption that its best use was as a luxury
residential development, a use that would require
tearing down the building on the property. If the
building was not torn down (an expensive undertaking),
the land alone, according to the appraisal, was worth
$16.5 million. Loyola didn't want to tear the building
down; it wanted to use it for student housing. It had
every reason therefore to offer more than Smithfield.
Farley had no intention of demolishing the building

either, and its intention to top Smithfield's bid was corroborated by the $16 million offer that it made for the property.

The judge was impressed by the fact that the defendant had told Smithfield that $9.5 million was too low an offer. By doing so, the judge reasoned, he had conferred a benefit on the school. But that was not the defendant's intention. His intention was to make sure that Smithfield was the winning bidder, since the finder's fee was contingent on Smithfield's getting the property. Whether in an honest bidding process the school would have obtained more than $15 million from Farley or Loyola or perhaps from some other potential buyer can't be determined with certainty because Levine prevented Farley and Loyola from keeping the bidding going and prevented everyone else who had expressed interest from even making offers.

The judge thought the defendant's interests perfectly aligned with the school's—thought that the more Smithfield bid, the more the school would receive, as well as the defendant. That is not true. The defendant did want Smithfield to be the high bidder, but he also wanted the bidding process to be rigged, to make sure Smithfield *was* the high bidder so that he would get his fee. The result of the rigging was to prevent the medical school from considering higher bids from Farley and Loyola and perhaps others.

In determining pecuniary loss for purposes of calculating a sentencing-guidelines range, the judge is required to determine the loss that the defendant "reasonably

should have known, was a potential result of the offense." U.S.S.G. § 2B1.1, Application Note 3(A)(iv). That potential loss in this case was the amount above $15 million that another bidder might have decided to pay for the property had the bidding been fair and open. As an experienced lawyer and businessman, the defendant must have known that a fair and open bidding process might well yield a higher price than Smithfield offered. In fact he knew that both Loyola and Farley wanted to pay more than Smithfield, which made sense because, as we said, both bidders wanted to use the building on the property rather than tear it down.

The judge's finding that the defendant had caused no loss blocked the alternative measure of loss in cases in which there is a loss but the precise amount of the loss cannot be determined: in such a case the criminal's gain is treated as the measure of loss. U.S.S.G. § 2B1.1, Application Note 3(B); *United States v. Serpico*, 320 F.3d 691, 698 (7th Cir. 2003); *United States v. Bhutani*, 266 F.3d 661, 668 (7th Cir. 2001); *United States v. Chatterji*, 46 F.3d 1336, 1340 (4th Cir. 1995). That makes good sense in this case. Smithfield was willing to pay $1.5 million to the defendant to obtain the property, and it must have thought that if it didn't pay that amount it would have to up its bid by at least that much to win an unrigged bidding contest. Only on that assumption did the kickback make sense from Smithfield's standpoint. From the defendant's standpoint, the more Smithfield paid, the better; but from Smithfield's standpoint, the goal of paying a finder's fee was to enable Smithfield to obtain

the property for a *smaller* total outlay (price plus finder's fee) than it would have had to pay otherwise.

There was at the very least a *probable* loss, and that is "loss" within the meaning of the guideline. *United States v. Johnson*, 16 F.3d 166, 170 (7th Cir. 1994); *United States v. Schneider*, 930 F.2d 555, 558 (7th Cir. 1991); *United States v. Stanley*, 12 F.3d 17, 21 (2d Cir. 1993). It is true that cases involving probable loss usually are ones in which the illegal scheme is interrupted, so that its consequences cannot be determined with certainty. Here it was not interrupted. But the consequences still cannot be determined with certainty, and it would be even more anomalous to give the defendant a sentencing break when there is no interruption by some outside force but instead the very nature of the scheme precludes a certain determination of loss.

The gain (and thus alternative measure of the loss) was the $1.5 million finder's fee. It is true that when originally negotiated, the fee was contingent on certain factors. But by the time of the defendant's sentencing, the contingencies had been dispelled and the defendant would have been entitled, had the scheme not been detected, to the full $1.5 million. That the fee was to be split with a coconspirator is of no significance. U.S.S.G. § 1B1.3(a); *United States v. Thomas*, 199 F.3d 950, 952-54 (7th Cir. 1999); *United States v. Boatner*, 99 F.3d 831, 834-37 (7th Cir. 1996). Dividing the gain by the number of conspirators would mean that the larger the conspiracy, the milder the punishment of each one. Anyway the defendant stood to gain $750,000 from his crime—not a negligible haul.

The zero loss found by the district judge created a guidelines sentencing range of zero to six months in prison; the correct loss figure of $1.5 million (which incidentally was within the range that the defendant agreed in the plea agreement was the intended loss attributable to his crime) ups the sentencing range to 33 to 41 months.

Ordinarily we would stop here and remand for resentencing. But the judge went on to rule that if he was wrong and there was a loss of $500,000, which would create a guidelines range of 27 to 33 months in prison, he would give the defendant a below-guidelines sentence of no prison—in fact the identical sentence that he imposed on the assumption of zero loss.

But $500,000 was also error. And while a judge can give a below-guidelines sentence, the sentence cannot stand if it is based on a legal, factual, or analytic (connecting law and fact) error that is not harmless. The court of appeals must "ensure that the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence—including an explanation for any deviation from the Guidelines range." *Gall v. United States*, *supra*, 552 U.S. at 51. "The allowable band of variance [in sentencing] is greater after *Booker* than before, but intellectual discipline remains vital." *United States v. Kirkpatrick*,  589 F.3d 414, 416 (7th Cir. 2009); see

also *United States v. Peña-Hermosillo*, 522 F.3d 1108, 1112 (10th Cir. 2008).

The judge committed three errors in his alternative ruling. First, the $500,000 figure was erroneous for the reasons we've given already. The correct figure was $1.5 million and the guidelines range was therefore higher than the judge thought. Second, repeating an error in his computation of loss, the judge thought that the defendant deserved leniency because he had intended no harm to the medical school, but on the contrary had intended a benefit—that the school should receive the highest bid from Smithfield. Notice the equivocation implicit in "highest bid from Smithfield." The highest bid from Smithfield is the bid that gets Smithfield the property; it is not the highest bid the seller would have obtained had the bidding process not been contaminated by the defendant's kickback.

The judge's third error was to give, without adequate articulated consideration, enormous weight to letters urging leniency for the defendant, while virtually ignoring the evidence that tugged the other way. There were 48 letters in all, some from members of the defendant's family and others from persons for whom he had done favors of a charitable nature, including gifts of money.

The judge committed three errors en route to deciding that the letters weighed more heavily in favor of leniency than the defendant's ethical violations as a lawyer, pointed out by the government, weighed in favor of severity. One error was his failure to discuss

any of the evidence that showed the defendant's character in a bad light. A sentencing judge is not required to mention every bit of evidence presented in the sentencing hearing, but an arbitrarily one-sided commentary on the evidence raises a warning flag. The judge did not remark the defendant's discussing the kickback scheme with Levine and telling him, "If two fucking schemers like you and I can't figure this out, then we got a problem." He did not mention the conspirators' decision to evade taxes by the defendant's giving Levine's wife a "loan" at a very high interest rate with the understanding that that there was no obligation to repay; Levine's cut would come from the loan. He did not mention *Ridge Chrysler Jeep, LLC v. DaimlerChrysler Financial Services Americas LLC*, 516 F.3d 623 (7th Cir. 2008), where our defendant assisted in a fraud by litigants who had, we said, "behaved like a pack of weasels." *Id*. at 627. He did not mention the lie that the defendant had told a district judge in 2002 when he was class counsel in a successful case and the judge had asked him whether he would be collecting any fees other than those set aside in a special lawyer's fund and he replied he would not—despite collecting $150,000 from the named plaintiffs under his contingency-fee agreement with them. The defendant had a history of ethical misconduct to which the judge without explanation gave negligible weight. Official judgments of misconduct were discounted in favor of letters procured by the defendant.

Second, the judge appears to have given no weight to the fact that the defendant is by normal standards (not

Warren Buffett or Bill Gates standards) wealthy; his annual income in recent years has sometimes exceeded $1 million. Wealthy people commonly make gifts to charity. They are to be commended for doing so but should not be allowed to treat charity as a get-out-of-jail card. *United States v. Repking*, 467 F.3d 1091, 1095-96 (7th Cir. 2006) (per curiam); *United States v. Ali*, 508 F.3d 136, 149 (3d Cir. 2007); *United States v. Cooper*, 394 F.3d 172, 176-77 (3d Cir. 2005). As the court in *Repking* put it (quoting *Cooper*), "charitable works must be exceptional before they will support a more-lenient sentence, for . . . 'it is usual and ordinary, in the prosecution of similar white-collar crimes involving high-ranking corporate executives . . . to find that a defendant was involved as a leader in community charities, civic organizations, and church efforts.'" 467 F.3d at 1095. People "who donate large sums because they can should not gain an advantage over those who do not make such donations because they cannot." *United States v. Thurston*, 358 F.3d 51, 80 (1st Cir. 2004), vacated on other grounds, 543 U.S. 1097 (2005); cf. *United States v. Stefonek*, 179 F.3d 1030, 1038 (7th Cir. 1999). "To allow any affluent offender to point to the good his money has performed and to receive a downward departure from the calculated offense level on that basis is to make a mockery of the Guidelines. Such accommodation suggests that a successful criminal defendant need only write out a few checks to charities and then indignantly demand that his sentence be reduced. The very idea of such purchases of lower sentences is unsavory, and suggests that society can always be bought off, even by those whose criminal misconduct

has shown contempt for its well-being." *United States v. McHan*, 920 F.2d 244, 248 (4th Cir. 1990).

Third, the judge ignored the fact that the defendant was for many years an influential Chicago alderman. Politicians are in the business of dispensing favors; and while gratitude like charity is a virtue, expressions of gratitude by beneficiaries of politicians' largesse should not weigh in sentencing. See *United States v. Wright*, 363 F.3d 237, 248-49 (3d Cir. 2004); *United States v. Serafini*, 233 F.3d 758, 773 (3d Cir. 2000); cf. *United States v. Morken*, 133 F.3d 628, 630 (8th Cir. 1998).

We are not laying down rules of sentencing. The sentencing discretion of federal judges is broad and our concern is not with the judge's having taken account of the defendant's good works but with his failure to consider the full range of evidence pertinent to a just sentence. That was an error, just like the judge's erroneous calculation of the applicable guidelines sentencing range. Appellate review of errors committed in sentencing is plenary. *Gall v. United States*, *supra*, 552 U.S. at 51; *United States v. Gibbs*, *supra*, 578 F.3d at 695 ("we review the procedures followed by the district court de novo"). Review turns deferential when the issue is the substantive reasonableness rather than the procedural regularity of the sentencing determination. The cascade of errors and omissions that we have identified cannot be dismissed as harmless, and so requires that the defendant be resentenced.

And in fairness to the government, which is entitled to the same consideration as other litigants, the resentencing should be by a different judge. (The government did not

ask us to order the case remanded to a different judge; repeat litigants—litigants who expect to appear before the same judge in the future—are for obvious reasons reluctant to request such relief. We commonly issue such orders, as we are authorized by our Circuit Rule 36 to do, without a request by a litigant.) One cannot read the 168-page transcript of the sentencing hearing, and the two memoranda attempting to justify the sentence that the judge issued *after* he had announced the sentence at the conclusion of the hearing, without sensing that the judge had committed himself irrevocably to a noncustodial sentence for the defendant. He pretty much announced this at the outset of the hearing, and he repeatedly expressed his anger with the government's lawyers over matters that did not warrant anger, such as the government's reference to the fraud as having been conducted by "insiders" (plural—Levine and the defendant). The judge said that Levine was indeed an insider by virtue of being a member of the fraud victim's board of trustees but that the defendant was not, and he excoriated the government's lawyer for calling him an insider. But all the lawyer had meant was that the defendant is a prominent "insider" in the Chicago, legal, business, and political communities. For the lawyer had merely said "I will use the term insider for Mr. Vrdolyak, in the sense of someone who is connected in this City to people who are in power." And the judge kept hectoring the government's lawyers about what he viewed as their misunderstanding of the real estate business; but we cannot fathom what that misunderstanding was.

Despite patient explanation by the government's law-
yers, the judge would not waver in his conviction that
the defendant had acted with the best interests of the
medical school in mind—which is untrue because the
school's interest was to have an honest bidding process
and the defendant knew it—and that the defendant had
acted out of friendship for Levine, who had financial
problems. (That was the Robin Hood defense.) The defen-
dant could have assisted Levine financially without
defrauding a medical school. Given the defendant's
prominence, his affluence, and his professional status as
a lawyer, his crime was especially gratuitous. When
Levine asked for assistance in defrauding the medical
school, the defendant did not hesitate and was quickly
able to find a company willing to pay the kickback. He
did not cooperate with the government in the investiga-
tion of the crime and did not plead guilty until the eve
of trial.

The gratuity of the crime suggests that there can be no
assurance that if let off with a slap on the wrist, the defen-
dant will not commit a future crime. He has lost his law
license, but the crime of which he has been convicted did
not require a law license. He did not benefit from
the crime—but only because he was caught.

The judge's errors in calculating the guidelines range
are indicative of an *idée fixe* that the defendant was not to
receive a custodial sentence, even (as the government
urged in the alternative) home confinement. In *United
States v. Peña-Hermosillo*, *supra*, 522 F.3d at 1117, the Tenth
Circuit held that "impos[ing] the same sentence under

an alternative rationale" had been a "procedural error," explaining that "it is hard for us to imagine a case where it would be procedurally reasonable for a district court to announce that the same sentence would apply even if correct guidelines calculations are so substantially different, without cogent explanation. In the absence of explanation, we might be inclined to suspect that the district court did not genuinely 'consider' the correct guidelines calculation in reaching the alternative ratio-nale." *Id*. See also our decision in *United States v. Anderson*, 517 F.3d 953, 965-66 (7th Cir. 2007), where we expressed concern with "blanket" sentences.

The judgment is reversed and the case remanded for resentencing before a different judge, pursuant to 7th Cir. Rule 36. We intimate no view on what a proper sentence would be.

REVERSED AND REMANDED.

HAMILTON, *Circuit Judge, dissenting*. I agree that the district court erred in the guideline loss calculation, but I respectfully dissent because that error was harmless. The record shows an experienced district judge con-sidering a difficult case thoroughly and exercising his discretion reasonably under 18 U.S.C. § 3553(a) to craft a sentence to fit both the crime and the criminal. The error

in the guideline calculation did not affect the final decision, and I find no abuse of discretion in the final decision about the sentence.

As the majority explains, given the nature of Vrdolyak's and Levine's crime, it is more accurate to say that there was a loss that cannot be determined reliably than to say that there was no loss to the victim of the crime. Where the crime makes it so difficult to determine with confidence the amount of the loss, the guidelines and cases from this and other circuits establish that the intended gain for the conspirators is a useful substitute for loss in applying the guidelines to gauge the severity of the crime. Application Note 3(B) to U.S.S.G. § 2B1.1 provides: "The court shall use the gain that resulted from the offense as an alternative measure of loss only if there is a loss but it reasonably cannot be determined." That approach has been used, for example, in *United States v. Briscoe*, 65 F.3d 576, 589-90 & n.16 (7th Cir. 1995) (affirming sentence of union president who defrauded union through kickback scheme with lender to union members; loss calculation based on defendant's gain), as well as in *United States v. Vinyard*, 266 F.3d 320, 332 (4th Cir. 2001) (affirming sentence in kickback scheme based on defendant's gain), and *United States v. Yeager*, 331 F.3d 1216, 1224-26 (11th Cir. 2003) (affirming sentence based on defendant's gain through scheme to divert drug sales through unauthorized dealers at lower prices).

But the guideline calculation is only the beginning of the story, for both the district court and this court. Pursuant to *United States v. Booker*, 543 U.S. 220, 259-60 (2005),

after calculating the applicable sentencing guideline range, the district court was required to look beyond the guidelines and to consider the case under 18 U.S.C. § 3553(a). Congress has instructed:

> The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection.

Paragraph (2) of subsection (a) requires the court to consider:

> the need for the sentence imposed—
>
> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. . . .

18 U.S.C. § 3553(a). The district court was required to consider the guidelines, but it was prohibited from presuming that a guideline sentence would be a reasonable sentence. *Rita v. United States*, 551 U.S. 338, 351 (2007).

At the end of the lengthy sentencing hearing in this case, the district judge addressed the factors and purposes under section 3553(a). He explained how and why he had concluded that a sentence of five years' probation

(which was above the guideline range he calculated), plus 2500 hours of community service and a fine, was sufficient but not greater than necessary to serve those purposes. The defendant committed a serious crime, but there were a number of factors that the district court could and did consider in mitigation. The defendant is 71 years old, had no prior criminal record, and posed little risk of repeat offenses. He had given up his law license. The crime of fraud did not involve violence, and there was no element of public corruption. The defendant had agreed to help a friend by committing the crime, but he was not the instigator of the crime and did not actually benefit from it. The district court was also impressed by a surprising volume of information showing the defendant's character was very different from his public image in the media. That information showed generosity with time, money, and influence to help people in need, especially where the defendant had no moral or other obligation to help them and where he received no publicity or recognition for his kindnesses. That is not the entire picture, of course, but those are all factors that could reasonably lead the district court to exercise its discretion under section 3553(a) to impose the sentence that it did. See *Gall v. United States*, 552 U.S. 38, 48-49 (2007) (affirming below-guideline sentence of probation and recognizing substantial restrictions on liberty imposed by sentence of probation).

Under *Booker* and *Gall* the district court is required to calculate the applicable sentencing guidelines for the crime and the criminal, and an error in the calculation is

a procedural error in sentencing that may require a re-
mand. *Booker*, 543 U.S. at 259-60; *Gall*, 552 U.S. at 49-51.
At the same time, however, it is clear that errors in cal-
culating the advisory guideline calculations are subject
to harmless error analysis. *E.g.*, *United States v. Abbas*,
560 F.3d 660, 666-67 (7th Cir. 2009) (holding guideline
error was harmless); *United States v. Anderson*, 517 F.3d
953, 965-66 (7th Cir. 2008) (same); see generally *Williams
v. United States*, 503 U.S. 193, 203 (1992) (stating before
*Booker* that guideline errors were subject to harmless
error analysis). In both *Abbas* and *Anderson*, the district
courts recognized the disputed guideline issues, stated
that their sentences would be the same regardless of
how the guideline issues were decided, and provided
thoughtful explanations of their reasoning. In such cases,
because the sentencing guidelines are no longer manda-
tory, appellate courts should readily find that guideline
errors are harmless.

Correct application of the guidelines can present many
difficult or esoteric questions, including many that have
little to do with the ultimate legal and moral judgment
about an appropriate sentence. Since *Booker*, this court
has often recognized that the sentencing judge may
impose a reasonable sentence under section 3553(a)
regardless of how a difficult guideline issue might be
resolved. "When a judge proceeds in this manner, she
must make clear that the § 3553(a) factors drive the sen-
tence without regard as to how the prior conviction
fits under a particular guideline. Doing so will make the
often nit-picking review of issues like this under our
now advisory guideline scheme unnecessary." *United*

*States v. Sanner*, 565 F.3d 400, 406 (7th Cir. 2009) (affirming above-guideline sentence without regard for correct resolution of guideline issue); *Abbas*, 560 F.3d at 666-67 (finding that district court erred in guideline calculation but holding error was harmless based on judge's explanation of alternative basis for same sentence). In this case, the judge considered the relevant factors thoughtfully and made his intentions and reasons clear. The precise level of loss in the judge's alternative guideline calculation did not drive the final decision.

As *Abbas* and *Anderson* make clear, this is not to say that a district court can insulate any sentence from appellate review by saying a few magic words about section 3553(a). *Abbas*, 560 F.3d at 666-67; *Anderson*, 517 F.3d at 965; accord, *United States v. Peña-Hermosillo*, 522 F.3d 1108, 1118 (10th Cir. 2008) (finding guideline error was not harmless where district court provided only "perfunctory" explanation for alternative rationale); see generally *United States v. Williams*, 431 F.3d 767, 773-76 (11th Cir. 2005) (Carnes, J., concurring) (encouraging district courts to provide alternative sentencing rationales where resolution of disputed guideline issues would not affect sentences). But where the record shows that the district court considered the disputed guideline issue, considered the prospect that its decision on the issue might be wrong, and provided a thoughtful explanation of its reasons under section 3553(a), it should be relatively easy to find that an error in calculating an advisory guideline was harmless, as I believe this one was. In some important respects, this case provides a

mirror-image of *United States v. Spano*, 476 F.3d 476 (7th Cir. 2007), a public corruption case in which the district court imposed a sentence on one defendant that was substantially higher than the proper guideline range. The district court imposed an upward departure of four levels for extraordinary abuse of trust, and this court held that the decision was an error. We found that the error was harmless, however, because the judge explained why he thought a guideline sentence that did not take into account the egregious abuse of trust would not be adequate. Despite the guideline error, we upheld the above-guideline sentence as a proper and sensible exercise of the district court's discretion under section 3553(a). *Id.* at 480-81. In this case involving private corruption, the district court imposed a sentence below the correct guideline range, but with a reasonable exercise of that same discretion.

The majority identifies three reasons why the loss calculation error should not be deemed harmless and concludes further that the case should be remanded to another district judge under Circuit Rule 36 to ensure the government a fair hearing. In my view, the criticisms here are not warranted, and the government received a fair hearing before the district court.

First, the majority criticizes the district court for basing the alternative sentencing rationale on the assumption that the guideline loss could have been no higher than $500,000, which would put the sentencing guideline range two offense levels lower than the correct range

here.[1] The district court's thorough discussion of the factors relevant to sentencing under section 3553(a) showed that the two-level difference would not have made any difference in the court's ultimate decision, so the error in calculating the loss under the guidelines had no effect. The sentencing range that is 14 levels below level 20 (the correct level) is the same as the range that is 14 levels below the level 18 the district court considered as its alternative—zero to six months in prison. And in fact, though we reach the conclusion from opposite directions, the majority and I agree that there is no point in remanding the case to Judge Shadur for a new guideline calculation and imposition of the same sentence as before. Where the majority sees a "cascade of errors and omissions," I see just one harmless error in the advisory guideline calculation.

Second, the majority criticizes the district court for believing the defendant intended no harm to the medical school and actually intended to benefit it by arranging for the highest bid from Smithfield. This criti-

---

[1] The correct guideline calculation starts with a base offense level of 6 under U.S.S.G. § 2B1.1(a)(2), adds 16 levels under § 2B1.1(b)(1)(I) for a loss of more than one million dollars, and subtracts two levels for acceptance of responsibility under § 3E1.1(a), for a total offense level of 20. With Vrdolyak's criminal history category of I, the sentencing guideline range is 33 to 41 months in prison. Using a loss of $500,000, the district court assumed an upward adjustment of 14 and a total offense level of 18, with a guideline range of 27 to 33 months in prison.

cism does not accurately reflect the record. On the first point, the district court pointed out correctly that there was no *evidence* that the defendant intended to hurt the medical school, see Gov't App. at 25, and the government itself had submitted evidence showing that the defendant had wanted Smithfield to pay "top dollar" for the property. See Def. Reply Mem. at 8 (quoting recorded conversation on March 31, 2006). The district court necessarily recognized, however, that the defendant must have realized that his help for his friend Levine would hurt the medical school by distorting the sale process in favor of the corrupt side deal to benefit Levine and the defendant. That's why the defendant is guilty. That's why the district court accepted his plea of guilty. On the second point, the furthest the district judge went was to note several times that the defendant's "finder's fee" (10 percent of the purchase price, to be split with Levine) would go up as Smithfield's purchase offer went up. Gov't App. 21-22, 25. I do not find in the record any indication that the district judge thought that the defendant, who had pled guilty to a serious crime and whom he was sentencing for that crime, acted with the intent to benefit the medical school. The district judge understood how Levine and Vrdolyak had corrupted the sale process—Vrdolyak had pled guilty, after all.

Third, the majority criticizes the district court for giving too much weight to numerous letters urging leniency in sentencing while giving too little weight to information that hurt the defendant's cause. On this topic, the majority identifies three more specific errors:

failing to discuss adequately the information weighing against the defendant, failing to consider the defendant's wealth and its effect on his ability to show mitigating good works, and ignoring the defendant's earlier work as an influential Chicago alderman.

These criticisms are not warranted. The record shows that the district court gave careful and discriminating consideration to the mitigating and aggravating information. The letters in mitigation came from the defendant's family and friends, and from others who described ways in which the defendant had helped them over the years. The district judge said that those letters were an "extraordinary outpouring that's not matched—at least in my recollection—in any other case that I have had coming up to be 29 years on the bench." Gov't App. 76.

Like victim impact statements, such letters are entirely appropriate in a sentencing hearing. Cf. *Gall*, 552 U.S. at 43 (affirming below-guideline sentence of probation where district court relied in part on "small flood" of letters from family, friends, neighbors, and business associates). The district court has an obligation to consider such letters when considering the history and characteristics of the defendant. See 18 U.S.C. § 3553(a)(1). Such letters often add little to the relevant picture of the defendant and his crime, but sometimes they can provide unexpected information and add new insights into the defendant's character.

This was such a case. The veteran district judge was surprised by what he learned. Like almost everyone

who has lived in Chicago over the past three or four decades, the judge had been generally aware of the reputation of "Fast Eddie" Vrdolyak, leader of the opposition to Mayor Harold Washington and power broker in Chicago politics. The judge did his best to put aside those preconceptions and to approach the sentencing decision with an open mind. He explained candidly:

> When I first encountered the case, and throughout its pendency, I never expected that I was going to reach the destination that I find called for here. And as I have indicated, I had (as I suspect anybody who has seen the political environment in Chicago over a long time frame probably shared) a perception of our defendant today that I suppose is epitomized by the moniker "Fast Eddie," indeed from the so-called Council Wars that existed during the Harold Washington mayoralty.

Gov't App. 135-36. In explaining that he would have reached the same result regardless of the guideline loss calculation, the judge said:

> In any event, the point I think that is most important is that when I applied 3553(a) I would reach the same result whichever of those views [about loss under the guidelines] is taken. And that's because I again surprised myself in terms of how I looked at this thing coming in, with the absence of a full appreciation or full understanding or disclosure of what the thing involved. I would not have dreamed of imposing a noncustodial sentence. But I have got to tell you that when you look at the 3553(a) factors,

it seems to me that the reasonable result, the one that is called for taking all of the considerations into account, is just what I have indicated.

*Id*. at 138. These frank observations of the judge—about the ways in which the facts overcame the defendant's public reputation and persuaded the judge to reach a result he had not expected to reach—deserve substantial weight.

Contrary to the majority's criticisms about failing to consider the defendant's wealth and influence, the district judge was discriminating in weighing the letters about the defendant's character. During the defense presentation, the judge commented:

I am not sure that things that are done for family members carry—or for that matter for what's called a public persona carries—much weight. *At least as I read these letters, the thing that I found frankly most persuasive on his part were the things that were not visible, and things in which at least according to these people he reached out in situations where he need not have done so. He had no obligation to do that either morally or otherwise and did it anyway.* And that's frankly the reason that I character- ized the letters that I received—not simply in terms of volume, but in terms of impact—as giving the kind of astonishingly different portrayal than what you have characterized as public persona.

Gov't App. 93 (emphasis added).

The most important mitigating information here in- volved not the "checkbook charity" that can be easy for

the wealthy, but many instances in which the defendant provided hands-on help in long-term relationships with people in need, or where he provided generous help anonymously. The district judge's comments show that he was much more impressed by these many instances of the defendant's generosity and kindness with his time and influence in situations where there was no visibility or public reward for his actions.[2]

Even with the appropriate discounting desired by the majority, the letters still have unusual persuasive weight, and the district court was not required to ignore or discount the evidence of past good works. The majority's observation that wealthy defendants should not get a break compared to poor ones merely because they have given away some of their wealth is certainly true but misses the district court's real point in weighing this mitigating information.

The majority writes that the district court "ignored the fact that the defendant was for many years an

---

[2] "But, surely, if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance. This elementary principle of weighing the good with the bad, which is basic to all the great religions, moral philosophies, and systems of justice, was plainly part of what Congress had in mind when it directed courts to consider, as a necessary sentencing factor, 'the history and characteristics of the defendant.'" *United States v. Adelson*, 441 F. Supp. 2d 506, 513-14 (S.D.N.Y. 2006), *aff'd mem.*, 301 Fed. Appx. 93 (2d Cir. 2008).

influential Chicago alderman." Slip op. at 13. This fact is relevant, the majority asserts, because politicians are in the business of dispensing favors, so that later expressions of gratitude for politicians' largesse should not be given weight in a sentencing decision. This criticism is not warranted. The defendant left public office more than 20 years ago, long before most of the events cited in mitigation. His history in Chicago politics and public life certainly did not escape the district judge's notice. The district judge's comment quoted above—discounting letters about things the defendant had done for his "public persona"—shows that the district court was quite conscious of precisely the point the majority faults him for ignoring. See also Gov't App. 137 (court referring to "the extraordinary volume and character of the things that I received in support of Mr. Vrdolyak, the kinds of thing that the public persona would never have dreamed existed, and I certainly not"). In other words, the letters that impressed the court most were those addressing private actions that were not designed to help the defendant himself, in his private or public life.[3]

---

[3] The letters of Dr. Mark Siegler and others described several instances in which the defendant intervened to enable needy people to obtain live-saving medical care that was not otherwise available to them. See Def. Ex. N (Siegler). The letter of Jonathan Kleinbard, a former vice president of the University of Chicago, told of a case in which Vrdolyak represented a plaintiff suing the University of Chicago Medical Center for medical malpractice. Vrdolyak failed in his effort to settle the

(continued...)

The majority criticizes the district court for not saying more about evidence putting the defendant's character in a bad light. The district court showed that it was familiar with the evidence the government had submitted, including the incidents cited from the defendant's legal career. The court acknowledged the "substantial information that's unfavorable to Vrdolyak" and said it was reminded of Dr. Jekyll and Mr. Hyde, as defense counsel urged a sentence for Dr. Jekyll and the government urged a sentence for Mr. Hyde. Gov't App. 76. The court specifically asked the defense to address the lawyer disciplinary matters, *id.* at 127, and the defense provided explanations that offered at least some mitigating effect. *Id.* at 128-29. Criticism of the district court for having failed to say more about these events, which had been the subject of two censures and one short suspension from practice, demands too much from an oral sentencing explanation.

Based on what is described as a "cascade of errors and omissions," the majority orders a remand under Circuit Rule 36 to another district judge for a fresh look at the sentence. I see instead just one harmless error, and I do not believe the government was denied a fair hearing. The majority concludes that Judge Shadur "had committed himself irrevocably to a noncustodial sentence for the

---

[3] (...continued)

case with Kleinbard's help, and he eventually won a judgment "in the millions of dollars." Kleinbard reported that Vrdolyak then donated his entire legal fee to the University of Chicago Medical Center. Def. Ex. Z.

defendant." Slip op. at 14. The majority criticizes the judge for having announced this view near the outset of the sentencing hearing, before the government had a chance to argue for a custodial sentence. This criticism is off target for two reasons.

First, it fails to acknowledge how much work the parties and the district court had put into the sentencing decision before the hearing itself. In detailed written briefs, the parties had set forth their positions on the guideline issues, the section 3553(a) factors, and the sentence that would be appropriate. The district judge's comments throughout the sentencing hearing show that he fully understood the parties' positions from the outset. Having done such extensive preparation, it would have been unusual for the judge not to have had a good idea how he intended to sentence the defendant, and why, at the beginning of the sentencing hearing.

Second, the fact that the judge signaled his informed inclinations early in the hearing does not call for criticism. Most lawyers appreciate knowing more rather than less about the judge's thinking while there is still an opportunity to persuade the court. This criticism is no more warranted than would be criticism that an appellate judge had a view of the case at the beginning of an oral argument. Such views do not mean that minds are closed to further persuasion by probative evidence and legal argument. See also Gov't App. 76-77 (district court inviting views and stating "I really have not reached a conclusion"). Judges must keep their minds open to new information that will change their thinking, as the district judge did in this case. And where the majority

finds in the record a district judge who was without justification impatient and angry with the government, I find a frank and wide-ranging discussion of the issues in the case, and some reasonable annoyance with overly aggressive arguments and invitations to speculate.[4]

Perhaps the most remarkable thing about the way this case has proceeded on appeal is that the government's briefs did not challenge the reasonableness of the sentence or ask for remand to a different judge. In its opening brief, the government argued only the guideline loss error. The government did not even bother to mention the district court's alternative guideline calculation and analysis under 18 U.S.C. § 3553(a). Where the district court has stated such an alternative basis, we should treat the appellant's silence as at least a forfeiture of the issue. And it is hard to believe that the government's approach to this appeal was not carefully considered in every respect. We would be justified in finding a waiver based on the government's failure to address the alternative calculation and its failure to challenge the reasonableness of the sentence.

Finally, although it is evident that the majority views the sentence here as simply not heavy enough to punish

---

[4] The majority criticizes the district court for refusing to consider after-the-fact evidence from other interested buyers about how much more they would have been willing to offer for the property. I see no abuse of discretion in the district court's decision not to spend time on the government's speculative effort to show the likely result of an honest effort to have sold the property for the best available price.

this crime adequately, we should not overlook an important dimension of this sentence that may in the end be more powerful than a shorter prison term. The idea of a person as prominent as Ed Vrdolyak doing 2500 hours of community service in Chicago has elements of public shaming and service that were well within the district court's discretion in deciding how best to accomplish the purposes of sentencing with a sentence "sufficient, but not greater than necessary," as section 3553(a) directs. It is hard to imagine that this defendant's community service could be completed without considerable news media attention, which would add to the deterrent effect of that portion of the sentence.

In sum, the record here shows that an experienced judge considered the case thoughtfully and learned information that overcame his initial inclinations in the case (and many public reactions to the case). The judge exercised his discretion under section 3553(a) and imposed a sentence reasonably tailored to fit both the crime and the criminal. Though the majority and I disagree with the district judge on the loss calculation under the advisory sentencing guidelines, that error was harmless because it did not drive the final sentencing decision under section 3553(a). I would affirm the district court's judgment.